In the

# United States Court of Appeals

## For the Seventh Circuit

No. 02-2667

FRANK H. BOOMER, ON BEHALF OF
HIMSELF AND ALL OTHERS SIMILARLY
SITUATED,

*Plaintiff-Appellee*,

v.

AT&T CORPORATION, A NEW YORK
CORPORATION,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 02 C 0847—**John W. Darrah**, *Judge.*

ARGUED SEPTEMBER 5, 2002 —DECIDED OCTOBER 3, 2002[*]

Before COFFEY, MANION, and DIANE P. WOOD, *Circuit Judges.*

MANION, *Circuit Judge.* Frank Boomer filed a putative class action lawsuit against AT&T, alleging that AT&T overcharged its customers for contributions to the federal Universal Services Fund. AT&T moved to compel arbitration and to dismiss or stay the pending action, arguing that after the Federal Communications Commission ("FCC") discontinued the filing of tariffs by

---

[*] This opinion is being immediately released in typescript. The printed version will follow.

telecommunication providers, AT&T had entered into a Consumer Service Agreement ("CSA") with Boomer which prohibited class actions and mandated arbitration. Boomer argued that the arbitration clause was unconscionable under Illinois law and he sought a declaratory judgment accordingly. The district court denied Boomer summary judgment on his declaratory judgment claim and denied AT&T's motion to compel arbitration and its motion to dismiss or stay the case. AT&T appeals, arguing that Boomer's state law challenge to the terms and conditions of the CSA is preempted by the Federal Communications Act of 1934, and Boomer is therefore bound by the CSA's arbitration clause. We agree and accordingly REVERSE.

## I.

Prior to 2001, the Communications Act of 1934 ("Communications Act"), as amended by the Telecommunications Act of 1996, required long distance carriers like AT&T to set forth their charges and other terms and conditions of service in tariffs filed with the FCC. 47 U.S.C. § 203. Under the "filed tariff doctrine," customers were bound by the terms of the tariff even if they had never seen the tariff, and even if the consumers had been promised service under different rates, terms or conditions. *See AT&T v. Central Office Telephone, Inc.*, 524 U.S. 214, 222 (1998). Additionally, customers were bound by the rates, terms, and conditions contained in the tariff unless the FCC determined that a tariff provision violated the substantive requirements of the Communications Act and the tariff was thereafter modified. *Id.*

Over time, however, the FCC began entering orders exempting "nondominant carriers" (defined as those lacking market power) from the tariff-filing requirements of Section 203 of the Communications Act. But the Supreme Court invalidated these orders, holding that the FCC lacked the authority under the Communications Act to exempt certain carriers from the tariff-filing requirement of Section 203. *See MCI Telecommunications Corp. v. AT&T Corp.*, 512 U.S.

218, 234 (1994). However, when Congress passed the Telecommunications Act of 1996, it expressly gave the FCC the authority to forbear from applying the tariff-filing requirement if, among other things, the FCC determined that the "enforcement of such regulation or provision is not necessary to ensure that the charges, practices, classifications, or regulations. . . are just and reasonable and are not unjustly or unreasonably discriminatory." 47 U.S.C. § 160(a)(1).

Armed with this new authority, the FCC issued a series of orders providing that AT&T and other long-distance carriers were no longer required to file tariffs. *See Interstate Interexchange Marketplace*, 11 FCC Rcd. 20,730 (1996); *Interstate Interexchange Marketplace*, 12 FCC Rcd. 15,014 (1997); *Interstate Interexchange Marketplace*, 14 FCC Rcd. 6004 (1999) ("Detariffing Orders"). Instead, the carriers were now required to provide customers with notice of the rates, terms, and conditions of service, and to offer customers service under such terms and conditions. The customers in turn could accept or reject the carrier's offer. The FCC anticipated that carriers would enter into such contracts through the use of "short, standard contracts." 11 FCC Rcd. at 20,736 (¶ 57).

After the FCC issued its detariffing orders, in June 2001 AT&T began mailing proposed Customer Service Agreements ("CSAs") to residential customers for their consideration. AT&T mailed each customer three documents: the CSA, a letter explaining why the CSA was being sent, and a list of anticipated frequently asked questions with explanatory responses ("CSA Mailing"). The CSA Mailing was sent to Boomer in June 2001 in an envelope, separate from his monthly bill. On the outside of the envelope was typed: "**ATTENTION:** Important information concerning your AT&T service enclosed."

The letter included with the CSA Mailing explained that AT&T was enclosing a "copy of the new AT&T Consumer Services Agreement containing the terms and conditions for

our state-to-state and international consumer long distance services," and that "[t]his Agreement will begin to apply to these AT&T services on August 1, 2001." The letter also explained that because of recent changes adopted by the FCC, the details of the service agreement were being provided directly to the customer. Additionally, the letter informed customers that "[t]he Agreement also describes our new binding arbitration process, which uses an objective third party rather than a jury for resolving any disputes that may arise." The letter further informed customers that they would "accept the terms of the Agreement simply by continuing to use or pay for any AT&T state-to-state or international consumer calling service."

The CSA included with the letter expanded on these points. On the first page of the CSA, AT&T explained in bold and capitalized text that:

**BY ENROLLING IN, USING, OR PAYING FOR THE SERVICES, YOU AGREE TO THE PRICES, CHARGES, TERMS AND CONDITIONS IN THIS AGREEMENT. IF YOU DO NOT AGREE TO THESE PRICES, CHARGES, TERMS AND CONDITIONS, DO NOT USE THE SERVICES, AND CANCEL THE SERVICES IMMEDIATELY BY CALLING AT&T AT 1-888-288-4099\* FOR FURTHER DIRECTIONS.**

Also significant for purposes of this appeal is Section 7, entitled "dispute resolution." That section began in bold and capitalized text, stating:

**IT IS IMPORTANT THAT YOU READ THIS ENTIRE SECTION CAREFULLY. THIS SECTION PROVIDES FOR RESOLUTION OF DISPUTES THROUGH FINAL AND BINDING ARBITRATION BEFORE A NEUTRAL ARBITRATOR INSTEAD OF IN A COURT BY A JUDGE OR JURY OR THROUGH A CLASS ACTION. YOU CONTINUE TO HAVE CERTAIN RIGHTS TO OBTAIN RELIEF FROM A FEDERAL OR STATE REGULATORY AGENCY.**

The CSA then detailed the arbitration requirement, providing:

> **a.  Binding Arbitration.**  The arbitration process established by this section is governed by the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 - 16.  You have the right to take any dispute that qualifies to small claims court rather than arbitration.  All other disputes arising out of or related to this Agreement (whether based in contract, tort, statute, fraud, misrepresentation or any other legal or equitable theory) must be resolved by final and binding arbitration.  This includes any dispute based on any product, service or advertising having a connection with this Agreement and any dispute not finally resolved by a small claims court.  The arbitration will be conducted by one arbitrator using the procedures described by this Section 7.

Section 7 then detailed the arbitration filing procedures and explained that any disputes involving $10,000 or less would be conducted in accordance with the rules of the Consumer Arbitration Rules of the American Arbitration Association, and claims in excess of that amount would be resolved under the AAA's Commercial Arbitration Rules. The CSA further provided that consumers filing an arbitration claim for less than $1,000 would only be required to pay a $20 filing fee, and that AT&T would cover the remaining costs of arbitration.  AT&T later amended the CSA to further reduce the potential arbitration expense, providing that AT&T would pay all but a $20 filing fee for customers with disputes up to $10,000 and all but $375 for claims between $10,000 and $75,000.

Additionally, Section 7 of the CSA provided—once again in bold and capitalized text—that:

> **NO DISPUTE MAY BE JOINED WITH ANOTHER LAWSUIT, OR IN AN ARBITRATION WITH A DISPUTE OF ANY OTHER PERSON, OR RESOLVED ON A CLASS-WIDE BASIS, THE ARBITRATOR MAY NOT AWARD DAMAGES THAT ARE BARRED BY**

**THIS AGREEMENT AND MAY NOT AWARD PUNITIVE DAMAGES OR ATTORNEYS' FEES UNLESS SUCH DAMAGES OR FEES ARE EXPRESSLY AUTHORIZED BY A STATUTE, YOU AND AT&T BOTH WAIVE ANY CLAIMS FOR AN AWARD OF DAMAGES THAT ARE EXCLUDED UNDER THIS AGREEMENT.**

Boomer did not contact AT&T to cancel his services, but instead continued to use AT&T's long distance services. Notwithstanding the CSA's prohibition of class actions and its arbitration clause, Boomer filed a putative class action against AT&T, alleging that AT&T was overbilling him for the federal Universal Service Fee charge.[1]  In his amended putative class action complaint, Boomer presented six counts:  Count I requested an accounting of the Universal Service Fee Charge; Count II alleged a violation of the Illinois Consumer Fraud Act and the Deceptive Business Practices Act; Count III alleged unjust enrichment; Count IV sought a declaratory judgment that the arbitration clause contained in Section 7 of the CSA was unconscionable and otherwise invalid; Count V alleged that the arbitration clause violated the Illinois Consumer Fraud Act and the Deceptive Business Practices Act; and Count VI alleged that the CSA violated the Communications Act.

AT&T responded to Boomer's suit by filing a motion to compel arbitration and to dismiss or stay the proceedings

---

[1]  In passing the Telecommunications Act of 1996, Congress authorized the FCC to assess a "Universal Service Fee" on long distance carriers based on a percentage of the carrier's past revenues, 47 U.S.C. § 254, although carriers may charge consumers to recover the cost of these contributions. *See* 12 FCC Rcd. 8776 (¶773).  The Universal Service Fees are then used to subsidize telecommunication services for customers in high cost areas, schools and libraries.  47 U.S.C. § 254.

pursuant to the Federal Arbitration Act. In support of its motion, AT&T submitted the declaration of Ellen Rein, the AT&T employee who had overseen the mailing of the CSAs to AT&T customers. Reid's declaration authenticated the CSA Mailing material and established that AT&T had in fact mailed Boomer the CSA Mailing in June 2001 and that the mailing was sent by third-class mail with forwarding service. AT&T did not receive notice from the postal service indicating that Boomer had not received the mailing. Her declaration also stated that Boomer continued to be enrolled in AT&T's long-distance service.

Boomer for his part filed a motion for partial summary judgment on Counts IV and V, arguing that the arbitration clause was, as a matter of law, unconscionable and violated the Illinois Consumer Fraud Act and the Deceptive Business Practices Act. The district court denied Boomer's motion for partial summary judgment and denied AT&T's motion to compel arbitration and to dismiss or stay the proceedings, on the grounds that "[g]enuine issues of material fact exist as to the validity of the arbitration clause." AT&T appeals.[2]

## II.

On appeal, AT&T argues that the district court erred in denying its motion to compel arbitration and to dismiss or stay Boomer's suit pending arbitration. Boomer responded to AT&T's appeal by filing a motion to dismiss the appeal for lack of jurisdiction. A motions panel of this court ordered that Boomer's motion to dismiss be considered by the merits panel. Accordingly, before considering the merits of AT&T's

---

[2] At oral argument, AT&T agreed that this appeal involves only Boomer's individual claim against AT&T, and not the putative class that Boomer sought to represent. *See Harold Washington Party v. Cook County, Illinois Democratic Party*, 984 F.2d 875, 878 (7th Cir. 1993) (if a putative class is not certified by the district court, the plaintiff's appeal concerns only the plaintiff's individual claim).

appeal, we first consider Boomer's motion to dismiss this appeal for lack of jurisdiction.

### A.  Motion to Dismiss for Lack of Jurisdiction

In his motion to dismiss for lack of jurisdiction, Boomer argues that this court lacks jurisdiction to consider AT&T's appeal because the district court had not conclusively ruled on the validity of the arbitration clause, but had merely concluded that it could not resolve the issue at the summary judgment stage. Therefore, according to Boomer, the district court's order is not final and appealable.

Although a decision must generally be final to be appealable, there are several exceptions to this rule.  Section 16 of the Federal Arbitration Act provides one such basis for immediate appeal, providing: "(a) An appeal may be taken from— (1) an order—(A) refusing a stay of any action under section 3 of this title, (B) denying a petition under section 4 of this title to order arbitration to proceed."  9 U.S.C. § 16(a)(1)(A) and (B).

In this case, the district court entered an order expressly stating:  "AT&T's Motion to Compel Arbitration and to Dismiss or Stay Proceedings is denied."  The court reiterated this point in its closing sentence, noting: "For the reasons stated above, Plaintiff's Motion for Partial Summary Judgment is denied.  Defendant's Motion to Compel Arbitration and to Dismiss or Stay Proceedings is denied." Nonetheless, Boomer contends that this court lacks jurisdiction over this appeal because the district court also entered a minute order which directed the parties "to confer and advise the Court within 10 days as to whether a separate trial should be ordered on [the arbitration counts] before the remaining counts of Plaintiff's Amended Complaint . . . ." This, according to Boomer, demonstrates that the district court intended to revisit the question of arbitrability and thus had not rendered a final decision on this issue.

We acknowledge that the district court intended to reconsider the question of arbitrability following further fact-finding and possibly a trial. However, that does not defeat this court's jurisdiction. The plain language of Section 16(a)(1) provides for an appeal from "an order refusing a stay" or "denying a petition to order arbitration to proceed," and the district court in this case expressly did both. Applying Section 16(a)(1) in *Koveleskie v. SBC Capital Markets, Inc.*, 167 F.3d 361, 363 (7th Cir. 1999), we held that a district court's denial of a motion to compel arbitration was immediately appealable even though the district court had held that further discovery was needed before it could conclusively rule on a motion to compel arbitration. In fact, jurisdiction is even clearer in this case than in *Koveleskie*, because here the district court expressly denied AT&T's Motion to Compel Arbitration, whereas in *Koveleskie*, the district court's order merely stated that discovery was needed "before a decision can be reached on the arbitration issue." *Id.* at 363. Nonetheless, in *Koveleskie*, we held that because "there is no doubt from the record that the district court denied the defendant's motion and clearly meant to foreclose arbitration," *id.*, an immediate appeal could proceed under Section 16(a) of the Arbitration Act.

Both the Third and Fourth Circuits have likewise concluded that a denial of a motion to compel arbitration is immediately appealable under Section 16(a)(1) of the FAA, even if further discovery is required or the district court intends to revisit the issue. *See Snowden v. Checkpoint Check Cashing*, 290 F.3d 631, 635-36 (4th Cir. 2002); *Sandvik AB v. Advent Inter. Corp.*, 220 F.3d 99, 102-04 (3d Cir. 2000). The Third Circuit's decision in *Sandvik* provides a thorough analysis of the issue and one that bears repeating. The reason a denial of a motion to compel arbitration is immediately appealable is because "[t]he language of § 16 provides for appeals of orders denying arbitration, and it makes no distinction between orders denying arbitration and 'final orders' that accomplish the

same end." *Id.* at 102. The language of Section 16(a)(1)(C) further illustrates that point. As *Sandvik* explained, Section 16(a)(3) of "the FAA contains a catch-all provision regarding any 'final decision with respect to an arbitration that is subject to this title,' id. § 16(a)(3)." *Id.* at 103. Thus, to interpret 16(a)(1) as Sandvik (and here Boomer) would have, namely as applying only to "final decisions," means "the provision providing for appeals from denials of orders to arbitrate [would become] surplusage in light of the more expansive language in § 16(a)(3)." *Id.* Thus, "[t]he more natural reading would therefore be to treat all orders declining to compel arbitration as reviewable." *Id.* Moreover, the language of § 16(a)(1)(C) "reflects that Congress decided to use the word 'final' in one part of the statute, but declined to do so in the section that declares that orders denying motions to compel arbitration are indeed appealable." *Id.* This reasoning defeats Boomer's argument that the district court's order denying a motion to compel arbitration must be final to be appealable. Additionally, the fact that "the statute provides a list of interlocutory arbitration-related orders that are not appealable, see id. § 16(b)," demonstrates that Congress intended what it said in subsection 16(a)—that a denial of the motion to compel arbitration is immediately appealable. *Id.* Finally, as *Sandvik* noted, "jurisdiction comports with the purposes of the FAA. Refusing [a defendant's] appeal could circumvent the FAA's clear purpose of enforcing binding arbitration agreements," by forcing the defendant to undergo a full-blown trial before a determination as to "whether it was legally obligated to participate in such a trial in the first instance." *Id.* at 104. For all of these reasons, we conclude that Section 16(a) of the Arbitration Act allows for an immediate appeal of the denial of a motion to compel arbitration.[3]

---

[3]    Boomer also relies on this court's decision in *McCaskill v. SCI Management Corp.*, 298 F.3d 677 (7th Cir.

(continued...)

Alternatively, Boomer claims that this court lacks jurisdiction because after the district court entered its order denying AT&T's motion to compel arbitration, the Judicial Panel for Multi-District Litigation entered an order transferring Boomer's case to the District Court of Kansas. Initially, we note that it is questionable as to whether the Judicial Panel's order transferring the case to the District Court of Kansas was effective, because that transfer order was not filed with the District Court of Kansas until the day after AT&T filed its notice of appeal. Under 28 U.S.C. § 1407(c), a Multi-District transfer order becomes effective only after it is "filed in the office of the clerk of the district court of the transferee district." 28 U.S.C. § 1407(c). Because AT&T filed its notice of appeal prior to the filing of the transfer order, it would seem that the transfer order is ineffective. *See, e.g., Kusay v. United States*, 62 F.3d 192, 193 (7th Cir. 1995) ("[T]he filing of a notice of appeal . . . divests the district court of its control over those aspects of the case involved in the appeal.").

---

[3](...continued)
2002), wherein we stated that "[a]n appeal may be taken from a 'final decision with respect to an arbitration', but not from an interlocutory order staying the action or 'compelling arbitration'. 9 U.S.C. §§ 16(a)(3), (b)(1), (b)(3)." *Id.* at 678. However, this language does not help Boomer because this case does not involve an order "staying the action or compelling arbitration," but rather an order denying a motion to compel arbitration and denying the motion to stay the action. While the FAA prohibits interlocutory appeals of motions compelling arbitration and granting stays, 9 U.S.C. § 16(b)(1), (b)(3), Section 16(a)(1) allows immediate appeals from the denial of such motions. 9 U.S.C. § 16(a)(1).

However, we need not determine the validity of the transfer order because even if a transfer order entered after a notice of appeal is filed were valid, this court nonetheless has jurisdiction under 28 U.S.C. § 1294(1) to hear AT&T's appeal from the district court's order denying AT&T's motion to compel arbitration. That section provides that "appeals from reviewable decisions of the district . . . courts shall be taken [f]rom a district court of the United States to the court of appeals for the circuit embracing the district." 28 U.S.C. § 1294(1). In this case, the "reviewable decision" at issue was entered by the Northern District of Illinois. Therefore, jurisdiction is appropriate in this court. *See, e.g.*, *TechnoSteel, LLC v. Beers Const. Co.*, 271 F.3d 151, 154 (4th Cir. 2001) (holding that the Fourth Circuit had jurisdiction to hear an appeal from a South Carolina district court's order denying a motion to compel arbitration, even though the district court also transferred the case to a Georgia district court).

**B.  Motion to Compel Arbitration**

Having concluded that we have jurisdiction over this appeal, we turn to the merits. As noted, AT&T argues on appeal that the district court erred in denying its motion to compel arbitration because Section 7 of the CSA required arbitration. Boomer initially contends that because the CSA does not constitute a valid contract under Illinois law, he never agreed to the arbitration clause. Alternatively, Boomer argues that the arbitration clause contained in the CSA is invalid because it is unconscionable under Illinois law and violates the Illinois Consumer Fraud Act. AT&T responds by arguing that because Boomer continued using his AT&T service, he accepted the terms of the CSA, including the arbitration provision. AT&T further contends that the Communications Act preempts Boomer's state law challenges to the validity of the arbitration clause. We first consider whether the CSA constitutes a contract, and then address the issue of preemption.

**1. Was the CSA a Contract**?

Boomer maintains that the CSA did not constitute a valid contract under Illinois law.[4] Initially we note that while Boomer alleged in his complaint that he did not recall receiving the CSA mailing, on appeal he does not claim that did not receive the CSA Mailing. Nor does he claim that he attempted to cancel his service with AT&T. Rather, Boomer argues that the CSA Mailing did not constitute an offer, that his silence did not constitute an acceptance, that there was no consideration supporting the arbitration clause, and that AT&T committed fraud.

Boomer first claims that the CSA did not constitute an offer because AT&T customers "would not recognize AT&T's mailing with the CSA as an offer to a contract." However, the letter accompanying the CSA clearly and explicitly stated that "[e]nclosed is your copy of the new AT&T Consumer Services Agreement containing the terms and conditions for our state-to-state and international consumer long distance services. This Agreement will begin to apply to these AT&T services on August 1, 2001." The cover letter further explained that the consumer was "accept[ing] the terms of the Agreement simply by continuing to use or pay for any AT&T state-to-state or international consumer calling service." Additionally, the CSA explained in bold, capitalized text at the beginning of the CSA that **"BY ENROLLING IN, USING, OR PAYING FOR THE SERVICES, YOU AGREE TO THE PRICES, CHARGES, TERMS AND CONDITIONS IN THIS AGREEMENT."** This plain, unambiguous language makes clear that the CSA constituted an offer. *See Architectural Metal Sys., Inc. v. Consolidated Sys., Inc.*, 58 F.3d 1227, 1229 (7th Cir.

---

[4] Although AT&T argues that the Communications Act preempts state law as to the validity of contractual terms and conditions, AT&T and Boomer both maintain that Illinois state law governs questions of contract formation. Therefore for purposes of appeal we will assume that Illinois state law determines whether a contract was formed.

1995), *citing McCarty v. Verson Allsteel Press Co.*, 411 N.E.2d 936, 943 (Ill. App. 1980) ("The test for an offer is whether it induces a reasonable belief in the recipient that he can, by accepting, bind the sender."). *See also*, Restatement (Second) of Contracts § 24 (1981) ("An offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it.").

Next, Boomer contends that his continued use of AT&T's long-distance service did not constitute an acceptance of AT&T's offer. In support of this argument, Boomer cites Section 69 of the Restatement (Second) of Contracts, which provides:

> (1) Where an offeree fails to reply to an offer, his silence and inaction operate as an acceptance in the following cases only:
>
> > (a) Where an offeree takes the benefit of offered services with reasonable opportunity to reject them and reason to know that they were offered with the expectation of compensation.

Boomer argues that he did not have a reasonable opportunity to reject the offer, and therefore his continued use of AT&T services did not constitute an acceptance. This argument also fails because the CSA Mailing clearly provided a mechanism for rejecting AT&T's offer: The cover letter stated in bold capitalized letters that "**IF YOU DO NOT AGREE TO THESE PRICES, CHARGES, TERMS AND CONDITIONS, DO NOT USE THE SERVICES, AND CANCEL THE SERVICES IMMEDIATELY BY CALLING AT&T AT 1-888-288-4099.**" Thus, Boomer had a reasonable opportunity to reject AT&T's offer, but nonetheless continued to use his AT&T services—services that were offered with the clear and explicit expectation of compensation. Under these circumstances, Boomer's silence constituted an acceptance. *See, e.g., Hill v. Gateway 2000, Inc.*, 105 F.3d 1147, 1148-49 (7th Cir. 1997) (concluding that under Illinois law the plaintiffs' silence constituted an accept

of the terms and conditions—including an arbitration clause—set forth on a form contract included in the box which contained the computer that the plaintiffs had ordered from the defendant and which they accepted).[5]

Boomer further challenges the existence of a contract by arguing that there was no consideration for the CSA. In support of this argument, Boomer first points to the following language: "[B]e assured that your AT&T service or billing will not change under the AT&T Consumer Services Agreement." Boomer claims that this language shows that he received nothing in exchange for his

---

[5] The district court distinguished *Gateway* by noting that in *Gateway* the Hills had admitted to receiving the form contract, but failed to read it, whereas in this case Boomer does not admit that he received the CSA Mailing. However, as noted above, Boomer does not contend that he did not receive the mailing–just that he does not remember receiving it. Where a letter is properly addressed and mailed, there is "a presumption that it reached its destination in usual time and was actually received by the person to whom it was addressed." *See Hagner v. United States*, 285 U.S. 427, 430 (1932). In this case, AT&T presented proof through the Declaration of Ellen Reid, the AT&T employee who oversaw the mailing of the CSA to AT&T customers, verifying that proper mailing procedures were followed. Boomer does not present any conflicting evidence in this regard. Thus, we must presume that Boomer received the mailing. *Id. See also Godfrey v. United States*, 997 F.2d 335, 338 (7th Cir. 1993) (a presumption exists that a mailing is received where there is "proof of procedures followed in the regular course of operations which give rise to a strong inference that the [correspondence] was properly addressed and mailed"). In any event, on appeal Boomer does not claim that the CSA did not constitute an offer because he did not receive the CSA mailing.

agreement to arbitration. This argument is misplaced—in exchange for his agreement to arbitrate, AT&T agreed to provide continued telephone services. It is true that when there is an existing contractual obligation, a promise to continue performing that legal obligation lacks consideration. But AT&T had no legal obligation to continue providing Boomer with telephone services. Therefore, Boomer received something of legal value—continued service—in exchange for his promise to arbitrate.

That AT&T could have canceled Boomer's telephone services is actually Boomer's second basis for claiming a lack of consideration: Boomer asserts that because AT&T expressly told him that if he did not agree to the terms of the CSA, it would cancel his service, there was no "bargained-for-exchange," and thus no consideration. This argument also fails, however, because, contrary to Boomer's position, the "bargained-for-exchange" requirement does not prohibit the execution of form contracts presented on a take-it-or-leave it basis. *See Metro East Center for Conditioning and Health v. Qwest Communications International, Inc.*, 294 F.3d 924, 926 (7th Cir. 2002) ("Yet we have held that form contracts, offered on a take-it-or-leave-it basis, are agreements for purposes of the Arbitration Act."). *See, e.g., Koveleskie v. SBC Capital Markets, Inc.*, 167 F.3d 361, 367 (7th Cir. 1999); *Hill v. Gateway 2000, Inc.*, 105 F.3d 1147, 1148 (7th Cir. 1997). Rather, under general contract principles a bargained-for exchange exists if one party's promise induces the other party's promise or performance. *See Hartbarger v. SCA Services, Inc.*, N.E.2d 596, 604 (Ill. App. 1990) ("A performance or return promise is bargained for if it is sought by the promisor in exchange for his promise and is given by the promisee in exchange for that promise.") (quoting Restatement (Second) of Contracts § 71 (1981)). *See also*, Restatement (Second) of Contracts § 71, comment b at 173 (1981) ("'Bargained for.' In the typical bargain, the consideration and the promise bear a reciprocal relation of motive or inducement: the consideration induces the making of the promise and the promise induces the furnishing of the

consideration."). In this case, AT&T's promise to continue telephone services (something it was not obligated to do) induced Boomer's corresponding promise (among other things) to arbitrate, and thus there was a bargained-for exchange and consideration. *See, e.g.*, *Metro East*, 294 F.3d at 926 (explaining that although the agreement's provision for arbitration may be non-negotiable, it is nonetheless an agreement "because the person could have chosen to do something else.").

Next Boomer argues that AT&T committed fraud by deemphasizing the CSA and presenting it as a non-event, whereas in reality by so inducing customers to agree to the CSA they waived valuable rights. Boomer, however, fails to point to any language in the CSA Mailing or in the accompanying CSA that was false or misleading. Moreover, the cover letter clearly and explicitly highlighted the differences between the CSA and the previous terms contained in the tariff, noting that "[t]he Agreement also describes our new binding arbitration process, . . . ." Thus, the plain language of the CSA Mailing negates Boomer's claim of fraud.

In sum, the CSA Mailing constituted an offer and Boomer's continued use of AT&T services constituted an acceptance. Consideration supported each party's promises and Boomer failed to present any evidence of fraud. Accordingly, the CSA constituted a contract, and as such established the terms and conditions governing AT&T's relationship with Boomer, one of which was an arbitration clause. Based on this clause, AT&T moved to compel arbitration of Boomer's claims against it. Boomer, however, contends that even if the CSA is a contract, the arbitration clause should not be enforced because it is unconscionable and violates the Illinois Consumer Fraud Act and the Deceptive Business Practices. AT&T responds that the Communications Act preempts Boomer's state law challenges to the validity of the arbitration clause. We now turn to the question of preemption.

### 2. Preemption of the Arbitration Clause

The doctrine of preemption emanates from the Supremacy Clause: "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . . shall be the Supreme Law of the land." U.S. Const., Art. VI, cl. 2. Because federal law is the supreme law of the land, it preempts state laws that "interfere with, or are contrary to, federal law." *Hillsborough County v. Automated Medical Laboratories, Inc.*, 471 U.S. 707, 712 (1985). A federal law may preempt a state law expressly, impliedly through the doctrine of conflict preemption, or through the doctrine of field (also known as complete) preemption. *Gracia v. Volva Europa Truck, N.V.*, 112 F.3d 291, 294 (7th Cir. 1997). With express preemption, a federal statute explicitly provides that it overrides state law. *Id.* Implied conflict preemption occurs where "it is impossible for a private party to comply with both state and federal requirements, . . . or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995) (internal quotations omitted). Finally, field (complete) preemption exists when "Congress . . . so completely preempt[s] a particular area, that any civil complaint raising that select group of claims is necessarily federal in character." *Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 63-64 (1987). On appeal, AT&T argues that Boomer's state law challenges to the validity of the arbitration clause are preempted either impliedly through conflict preemption or through the doctrine of field (complete) preemption, and therefore, AT&T maintains, the arbitration clause governs and the district court should have granted its motion to compel arbitration and to stay the proceedings.

### a) Implied Preemption

As summarized above, implied preemption exists if it is either impossible to comply with both state and federal law, or if state law conflicts with a federal objective. *Gracia*, 112 F.3d at 294. AT&T contends that a state law challenge

to the validity of the arbitration clause violates Congress's objective in passing the Communications Act, and specifically conflicts with the objectives of Sections 201(b) and 202(a) of the Communications Act.

Section 201(b) of the Communications Act provides:

All charges, practices, classifications, and regulations for and in connection with such communication service, shall be just and reasonable, and any such charge, practice, classification or regulation that is unjust or unreasonable is declared to be unlawful.

47 U.S.C. § 201(b).

Section 202(a) states:

It shall be unlawful for any common carrier to make any unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities, or services for or in connection with like communication service, directly or indirectly, by any means or device, or to make or give any undue or unreasonable preference of advantage to any particular person, class of persons, or *locality* or to subject any particular person, class of persons, or *locality* to any undue or unreasonable prejudice or disadvantage.

47 U.S.C. § 202(a) (emphasis added).

Based on these provisions, AT&T claims that a state law challenge to the validity of the arbitration clause is preempted. For three main reasons, we agree. First, these provisions, and the Communications Act in general, demonstrate a congressional intent that customers of individual long-distance carriers receive uniform terms and conditions of service; however, allowing a state law challenge to the CSA's arbitration clause would result in customers receiving different terms based on their locality. Second, the incorporation of the arbitration clause in the CSA allows AT&T to offer lower rates, and allowing state law to

invalidate this clause will affect the rates AT&T offers, resulting in discriminatory rate structures. Third, Section 201 declares unlawful rates, terms and conditions which are not just and reasonable, demonstrating Congress's intent that federal law govern the validity of the terms and conditions of long-distance service contracts.

First, Sections 201 and 202, read together, demonstrate a congressional intent that individual long-distance customers throughout the United States receive uniform rates, terms and conditions of service. *See, e.g., American Telephone & Telegraph Co. v. Central Office Telephone, Inc.*, 524 U.S. 214, 223 (1998) ("It is that antidiscriminatory policy which lies at 'the heart of the common-carrier section of the Communications Act.'") (citing *MCI Telecommunications Corp. v. American Telephone & Telegraph Co.*, 512 U.S. 218 (1994)). Yet, a state law challenge to the validity of the terms and conditions of a telephone service agreement would result in the application of fifty bodies of law, and this would inevitably lead to customers in different states receiving different terms and conditions. Boomer's own lawsuit demonstrates this point, as he not only challenges the validity of the arbitration clause, but also the validity of the attorney's fees provision and the clause prohibiting class action lawsuits.[6]   Absent

_____

[6]  While Boomer challenges the validity of the CSA's provision concerning the right to attorney's fees and the clause prohibiting the use of a class action, because we conclude that arbitration is required, these other challenges must be decided by the arbitrator in the first instance. *Metro East*, 294 F.3d at 929. *See also Larry's United Super, Inc. v. Werries*, 253 F.3d 1083, 1086 (8th Cir. 2001) (holding that on appeal from an order denying a motion to compel arbitration, a court may only determine whether a dispute is subject to arbitration; other contractual challenges must be determined by the arbitrator). Of course in considering Boomer's other

(continued...)

preemption, there is nothing to prevent similar state law challenges to the CSA's other terms and conditions. This will result in patchwork contracts, because under some states' laws some clauses will be upheld and other invalidated, while under other states' laws, it may well be the opposite. This conflicts with Section 202's prohibition on providing advantages or preferences to customers based on their "locality." 47 U.S.C. § 202.

Second, a state law challenge to an arbitration clause (or for that matter a provision prohibiting class actions) not only affects the uniformity of that term, but it also threatens to destroy the consistency of rates offered consumers throughout the United States. As we recognized in *Metro East*, 294 F.3d 924, arbitration offers cost-saving benefits to telecommunication providers and "these benefits are reflected in a lower cost of doing business that in competition are passed along to customers." *Id.* at 927. However, if in some states arbitration clauses are stricken as unconscionable or illegal under various states' consumer protection laws, whereas in other states such provisions are validated, the overall cost savings will be reduced. AT&T and other providers would then be faced with three

---

[6](...continued)
challenges, the arbitrator will be required to apply the appropriate law, which given our holding today means that the Communications Act preempts other state law challenges to the validity of the terms and conditions contained in the CSA. *Cf. Metro East*, 294 F.3d at 929 ("An arbitrator has no more power to alter a tariff's rate than does a judge; and because *Central Office Telephone* treats conditions and other tariff terms as part of the rates, it may follow that an arbitrator must take the whole tariff as he finds it, in order to avoid any possibility of discriminatory application (that bugbear of rate-regulation systems, and the main target of the filed-rate doctrine).").

options—increase the rates of those living in litigation (as opposed to arbitration) states, increase everyone's rates, or leave rates the same. The first option results in differing rates which violates the intent (if not the terms, *see infra* at ___ n.8), of the Communications Act. *See AT&T v. Central Office Telephone, Inc.*, 524 U.S. 214, 223 (1998) ("[T]he policy of nondiscriminatory rates is violated when similarly situated customers pay different rates for the same services."). The second and third options (the latter of which is economically unrealistic),[7] while on their face do not vary

---

[7] It is unreasonable to assume that rates would remain the same even if the arbitration clause were invalidated because, as *Metro East* recognized, arbitration offers cost-saving benefits to telecommunication providers and "these benefits are reflected in a lower cost of doing business that in competition are passed along to customers." *Id.* at 927. Realistically, then, without the arbitration provision, AT&T and other carriers would be forced to increase rates across the board in order to prevent discriminatory pricing. Besides being unfair to customers who must now pay higher rates while still subject to arbitration clauses (held valid in their home states), this outcome conflicts with Congress's intent in passing the Telecommunications Act of 1996. Specifically, in passing the Telecommunications Act of 1996, Congress sought "to promote competition and reduce regulation in order to secure lower prices and higher quality services for American telecommunications consumers . . . ." Preamble, Telecommunications Act of 1996, Pub. L. No. 104-104, 110 State. 56 (1996). Moreover, IF the detariffing provisions of the Telecommunications Act subject the terms of nationwide long-distance form contracts to state law attack, the transactional costs and litigation expenses would also increase. Carriers would then face the continuous cost of

(continued...)

the rates consumers receive, nonetheless constitute "discrimination in charges." As the Supreme Court recognized in *Central Office*, "rates . . . do not exist in isolation," *id.* at 223, and "'discrimination in charges' . . . can come in the form of a lower price for an equivalent service or in the form of an enhanced service for an equivalent price." *Id.* at 223 (quoting *Competitive Telecommunications Assn. v. FCC*, 998 F.2d 1058, 1062 (D.C. Cir. 1993)). Thus, if AT&T charges its customers the same rate, but provides different terms and conditions for service, that too is a form of "discrimination in charges." Accordingly, even if AT&T leaves its rates the same (or increases everyone's rates), consumers will still face discriminatory charges, as some customers will be bound by the arbitration clause and others will not be. Those not bound will obtain that same rate without subjecting themselves to the terms and conditions which made that rate possible. *See Metro East*, 294 F.3d at 927 ("Customers therefore are compensated through lower rates for any net loss they may experience in arbitration. They can't accept the lower rates . . . while avoiding the means that made lower rates possible.").

Of course, Section 202(a) only prohibits "undue" or "unreasonable" discrimination, and thus it is possible that

---

[7](...continued)

court challenges and the added expense of revising and distributing modified CSAs which conform with new state court rulings. Consumers would bear the brunt of this through higher prices for telephone service. This too is at odds with Congress's intent. It also belies the FCC's belief that the transactional costs of detariffing would be fixed and short-lived. *See*, 11 FCC Rcd. at 20,736 (¶ 57) (recognizing that detariffing would result in some "increased administrative costs," but anticipating those costs to be *initial* (and fixed) costs only resulting from "the shift to a detariffed environment . . . (such as the cost of developing short, standard contracts)").

AT&T could justify its disparate charges because state law caused the discrimination by invalidating the arbitration clause in some states, but not others. *See, e.g.*, *Panatronic, USA v. AT&T Corp.*, 287 F.3d 840, 844 (9th Cir. 2002) ("A difference in price is not unreasonable if there is a neutral, rational basis underlying [the disparity].") (internal quotes omitted). However, allowing state law to determine the validity of the various terms and conditions agreed upon by long-distance providers and their customers will create a labyrinth of rates, terms and conditions and this violates Congress's intent in passing the Communications Act.[8]

Third, it is clear from Section 201(b) that Congress intended federal law to govern the validity of the rates, terms and conditions of long-distance service contracts. As excerpted above, that section requires all charges and practices related to communication service to be just and reasonable, and it declares unlawful any unjust or unreasonable charges or practices. 47 U.S.C. § 201(b). This language demonstrates Congress's intent that federal law determine the reasonableness of the terms and conditions of long-distance contracts. *See also In re Long Distance Telecomm. Lit.*, 831 F.2d 627, 631 (6th Cir. 1987) ("Section 201(b) speaks in terms of reasonableness, and the very charge of Count I is that the defendants engaged in unreasonable practices. This is a determination that 'Congress has placed squarely in the hands of the [FCC]'") (quoting *Consolidated Rail Corp. v. National Ass'n of*

---

[8] On the other hand, if the resulting discrimination was not considered "reasonable," then AT&T would be in violation of Section 202(a). In that case, state law would not just conflict with a federal objective, but it would directly conflict with federal law because it would be impossible for AT&T "to comply with both state and federal requirements, . . . ." *Freightliner Corp. v. Myrick*, 514 U.S. at 287.

*Recycling Indust. Inc.*, 449 U.S. 609, 612 (1981)).[9]   While
Boomer challenges the arbitration clause under the state
law doctrine of unconscionability and various state consumer
protection statutes, in essence the question is the
same—whether the term is fair and reasonable.  Permitting
such state law challenges would open the door for direct
conflicts between federal and state law on the validity of
terms and conditions contained in a long-distance service
contract.  For example, the FCC specifically adopted a policy

_____

   [9]  Section 207 of the Communications Act authorizes
"[a]ny person claiming to be damaged by any common carrier
subject to the provisions of this chapter" to file a complaint
with the FCC.  47 U.S.C. § 207. Additionally, Section 208
provides: "(a) Any person, any body politic or municipal
organization, or State commission, complaining of anything
done or omitted to be done by any common carrier subject to
this chapter, in contravention of the provisions thereof, may
apply to said Commission by petition which shall briefly state
the facts, whereupon a statement of the complaint thus made
shall be forwarded by the Commission to such common
carrier, who shall be called upon to satisfy the complaint or
to answer the same in writing within a reasonable time to be
specified by the Commission." 47 U.S.C. § 208. Boomer could
have filed a complaint with the FCC under Section 207 or
Section 208, arguing that the arbitration clause violates
Section 201(b) because it is unjust or unreasonable. *Cf. In re
Long Distance*, 831 F.2d at 631 (concluding that FCC has
primary jurisdiction to determine if a term and condition of
a long-distance service contract constitute an unreasonable
practice); *Metro East*, 294 F.3d at 927 (holding that FCC
possesses exclusive authority to set aside an arbitration
clause contained in a filed tariff).  However, Boomer did not
pursue this course of action.

encouraging the use of alternative dispute resolution in its administrative procedures.  47 C.F.R. § 1.18.   Also, in the past, tariffs filed by other carriers have include arbitration clauses and those clauses have been enforced.  *See Metro East*, 294 F.3d at 926-27.  The FCC has also concluded that class actions are "neither contemplated by, nor inconsistent with" the Communications Act's complaint remedies. *Krauss v. MCI*, 14 FCC Rcd. 2770, 2775-76 (¶ 10).  Yet, if Boomer would have his way, arbitration provisions and clauses prohibiting class actions would be illegal under state law, even if they were considered "just and reasonable" under federal law.   The Supremacy Clause prohibits such an outcome.

Boomer argues in response that following detariffing federal law no longer preempts state law challenges to the validity of contractual provisions.   Specifically, Boomer claims that because the FCC no longer requires long-distance providers to file tariffs, 47 U.S.C. § 160, the cases which had held that the Communications Act preempts state law are now inapplicable.  In support of his position, Boomer cites *Ting v. AT&T*, 182 F.Supp. 2d 902 (N.D. Cal. 2002), a class action suit challenging, among other things, the validity of AT&T's arbitration clause under California law. The court in *Ting* rejected AT&T's preemption argument and its reliance on decisions rendered before detariffing, concluding that "[i]n light of the clear purpose of the filed rate doctrine, AT&T's reliance on these cases is misplaced." *Id*. at 937.

Boomer is correct that the filed-rate doctrine and the tariff-filing requirement demonstrated Congress's intent to preempt state law challenges to the terms and conditions contained in the tariff.   However, Section 203, which required the filing of tariffs, merely served as a mechanism by which the FCC could assure compliance with the standards set forth in Sections 201 and 202.  *See MCI*, 512 U.S. 230 ("[T]his Court has repeatedly stressed that rate filing was Congress's chosen means of preventing unreasonableness and discrimination in charges.").   Thus,

the filing requirement furthered the Communications Act's purpose of prohibiting and punishing unequal rates and preventing discrimination. *Id.* Following detariffing, those goals remain, as do the substantive requirements of Sections 201 and 202. It is just that now Congress believes that these goals can be met without tariffs. In fact, in authorizing the FCC to forego the tariff-filing requirement, Congress required the FCC to first assure itself that the filing of a tariff was "not necessary to ensure that the charges, practices, classifications, or regulations . . . are just and reasonable and are not unjustly or unreasonably discriminatory." 47 U.S.C. § 160(a)(1). Thus, even though the FCC no longer mandates the filing of tariffs, the congressional objective of providing uniform rates, terms and conditions remains, as does the federal prohibition on terms and conditions which are unjust or unreasonable. Moreover, following detariffing, the FCC intended customers to retain the right to challenge the justness and reasonableness of long-distance providers' charges and practices under Section 208. *Interstate Interexchange Marketplace*, 11 FCC Rcd. at 20,730 (¶ 21). Additionally, the FCC made clear that its decision eliminating the tariff requirement did "not affect [the FCCs] enforcement of carriers' obligations under sections 201 and 202." *Interstate Interexchange Marketplace*, 12 FCC Rcd. at 15,057 (¶ 77). Therefore, detariffing does not alter the fundamental design of the Communications Act, nor modify Congress's objective of uniformity in terms and conditions for all localities. Accordingly, we reject Boomer's argument and his reliance on *Ting*.[10]

_____

[10] Boomer also argues that *Ting* collaterally estops AT&T from challenging the validity of the arbitration clause because the court in *Ting* held that the arbitration clause was unconscionable. However, for collateral estoppel to bar subsequent litigation, among other things, the issue sought to be precluded must be the same as involved in the prior

(continued...)

Boomer next contends that the FCC's detariffing orders support his position that federal law does not preempt his state law challenges to the validity of the arbitration clause. Specifically, Boomer cites to the FCC's response to AT&T, Sprint and WorldCom's request that the FCC "[c]larify that federal, and not state, law governs the determination as to whether a nondominant interexchange carrier's rates, terms, and conditions . . . are lawful," 12 FCC Rcd. at 15,057 (¶ 76), wherein the FCC stated:

---

[10](...continued)

case. *Chicago Truck Drivers, Helpers & Warehouse Union (Independent) Pension Fund*, 125 F.3d 526, 530 (7th Cir. 1997). In *Ting*, the question of unconscionability involved California law, whereas in this case it involves Illinois law, and therefore the issues are not the same. In fact, because we conclude that Boomer's state law challenge to the arbitration clause is preempted by the Communications Act, the issue of unconscionability is not even in play. Moreover, while on appeal Boomer perfunctorily states in a footnote that *Ting* collaterally estops AT&T from arguing that the Communications Act preempts his state law challenges to the arbitration clause, he fails to support this position with any legal analysis or citation. Therefore he has waived that argument. *Rekhi v. Wildwood Indust., Inc.*, 61 F.3d 1313, 1317 (7th Cir. 1995). Finally, even had Boomer not waived this argument, because the issue of preemption involves a pure question of law and because *Ting* is currently on appeal to the Ninth Circuit, we would still conclude that *Ting* has no preclusive effect. *See, e.g., Chicago Truck Drivers*, 125 F.3d at 532-33 (holding that collateral estoppel did not bar the defendant from relitigating a pure question of law, and noting that that is especially true "when the issue is of general interest and has not been resolved by the highest appellate court that can resolve it") (internal quotation omitted).

We therefore agree with AT&T, Sprint, and WorldCom that the Communications Act continues to govern determinations as to whether rates, terms, and conditions for interstate, domestic, interexchange services are just and reasonable, and are not unjustly or unreasonably discriminatory. While the parties only sought clarification that the Communications Act governs the determination as to the lawfulness of rates, terms, and conditions, we note that the Communications Act does not govern other issues, such as contract formation and breach of contract, that arise in a detariffed environment. As stated in the *Second Report and Order*, consumers may have remedies under state consumer protection and contract laws as to issues regarding the legal relationship between the carrier and customer in a detariffed regime.

12 FCC Rcd. at 15,057 (¶77).

Boomer focuses on the FCC's pronouncement that "the Communications Act does not govern other issues, such as contract formation and breach of contract," as well as its statement that "consumers may have remedies under state consumer protection and contract laws." Boomer argues that this language demonstrates that federal law does not preempt his state law challenge to the validity of the arbitration clause. That argument, however, ignores the earlier language wherein the FCC stated that "the Communications Act continues to govern determinations as to whether rates, terms, and conditions . . . are just and reasonable, and are not unjustly or unreasonably discriminatory," and the FCC's statement that "the Communications Act governs the determination as to the lawfulness of rates, terms and conditions, . . ." Thus, while state law may determine whether a contract has been

formed, federal law still governs the validity of the rates, terms and conditions of the contract.[11]

Finally, Boomer cites to the historical notes to 47 U.S.C. § 152 which provide: "This Act and the amendments made by this Act shall not be construed to modify, impair, or supersede Federal, State, or local law unless expressly so provided in such Act or amendments." 47 U.S.C. § 152, Historical Statutory Notes. Boomer contends that this savings clause demonstrates that Congress did not intend to preempt state law challenges to the terms and conditions of the CSA. However, Section 152 was passed as part of the Telecommunications Act of 1996 and by its own terms applies only to "[t]his Act and the amendments made by this Act." "This Act" is the Telecommunications Act of 1996, and not the Communications Act of 1934, of which Section 201 and 202 are part. Therefore, rather than support Boomer's position, the historical notes to Section 152 confirm that the Telecommunications Act did not "modify, impair or supersede" Sections 201 and 202, and their goals of uniformity and non-discrimination.

In sum, in passing the Communications Act Congress sought to ensure that consumers would receive uniform rates and that consumers would not be discriminated against

---

[11] In *Ting*, the district court concluded that under California law the doctrine of unconscionability concerns the formation of a contract. However, whether state law treats unconscionability as a doctrine preventing the formation of a contract or as a defense barring enforcement of a term of a contract, the effect is the same—a contractual provision is declared illegal under state law. Either way, the outcome conflicts with the federal objective of the Communications Act. Accordingly, even if under state law a challenge to the validity of a term or condition of a long-distance service contract is characterized as an issue of contract "formation," that state law challenge is nonetheless preempted.

based on their locality. Allowing state law challenges to the validity of the terms and conditions contained in long-distance contracts, however, results in the very discrimination Congress sought to prevent. Moreover, the arbitration clause serves to lower customers' rates, and thus an indirect result will be price discrimination, either directly or indirectly (i.e. because customers paying the same price receive different contractual rights). Finally, Section 201(b) clearly demonstrates Congress's intent that federal law determine the fairness and reasonableness of contractual terms, as opposed to state law principles such as unconscionability. For all of these reasons, we conclude that Boomer's state law challenges to the validity of the arbitration clause are impliedly preempted by the Communications Act.

### b) Field Preemption

In addition to arguing that Boomer's state law challenges to the arbitration clause are preempted because they conflicts with the federal objective of the Communications Act, AT&T also contends that in passing the Communications Act, Congress completely preempted any state law regulation of long-distance contracts. Prior to detariffing, this court held that the Federal Communications Act completely preempted state law challenges to the terms and conditions contained in a filed tariff. *Cahnmann v. Sprint Corp.*, 133 F.3d 484, 489-90 (7th Cir. 1998). However, following detariffing, there appears to be some role for state law, *see* 12 FCC Rcd. at 15,057 (¶77), although it cannot operate to invalidate the rates, terms or conditions of a long-distance service contract. It would therefore seem that under the new detariffed regime federal law no longer completely preempts state law. But we need not resolve this issue today as Boomer's state law challenges to the arbitration clause are nonetheless preempted under the doctrine of impliedly conflict preemption. Accordingly, Boomer is bound by the arbitration clause and his claims must be submitted to arbitration.

### III.

Following detariffing, AT&T mailed Boomer an offer (in the form of the CSA) to provide long-distance services. Boomer accepted this offer by continuing to use AT&T's services, and therefore the CSA constitutes a contract. Among other things, the CSA included an arbitration clause. While Boomer contends that that clause is unconscionable under state law and violates the Illinois Consumer Fraud Act and the Deceptive Business Practices Act, the Communications Act preempts state law challenges to the validity of contractual provisions because the Communications Act seeks to promote the uniformity of rates, terms and conditions, and state law challenges to the legality of contractual provision would destroy that objective. Accordingly, Boomer cannot challenge the validity of the arbitration clause under state law, and instead must submit to arbitration. We therefore REVERSE and compel arbitration of Boomer's claims. The underlying proceedings are further stayed pending the outcome of arbitration.