MURPHY, Circuit Judge.
I. Introduction
This multidistrict litigation involves multiple class action lawsuits arising from the billing practices of defendant AT & T Corporation. Each class of plaintiffs challenged the lawfulness of a monthly line-item charge defendant imposed on its customers to recover contributions to the federal Universal Service Fund (“USF”) required by 47 U.S.C. § 254. One subclass of plaintiffs, comprising all residential long-distance customers of AT & T in California, proceeded to trial and was awarded $16,881,000 in damages. The district court remitted the verdict to $10,931,000, and awarded prejudgment interest of $5,546,958.41, for a total award of $16,477,958.41. On appeal, AT & T argues it is entitled to judgment as a matter of law or a new trial. It alternatively asserts it is entitled to a further remittitur of the jury’s damages award. On cross-appeal, plaintiffs argue the district court erred in enforcing AT & T’s arbitration clause against non-California residential plaintiffs and in granting partial summary judgment on AT & T’s business customers’ breach of contract claims. Exercising jurisdiction under 28 U.S.C. § 1291 and 9 U.S.C. § 16(a)(3), this court AFFIRMS the decisions of the district court.
II. Background
Under the Federal Communications Act of 1934 (“FCA” or “1934 Act”), telecommunications carriers were required to file with the Federal Communications Commission (“FCC”) a list of tariffs showing “all charges ... and ... the classifications, practices, and regulations affecting such charges.” 47 U.S.C. § 203(a). The 1934 Act also prohibited carriers from extending rates, terms, or conditions that differed from their filed tariffs. 47 U.S.C. § 203(c); AT & T v. Cent. Office Tel., Inc., 524 U.S. 214, 222, 118 S.Ct. 1956, 141 L.Ed.2d 222 (1998). The goal of this “filed rate doctrine” was to ensure uniformity in the rates, terms, and conditions offered to the purchasers of telecommunications services. Cent. Office Tel., 524 U.S. at 222-23,118 S.Ct. 1956.
During the 1970s and 1980s, advances in the telecommunications industry gradually eroded the utility of the filed rate doctrine. Ting v. AT & T, 319 F.3d 1126, 1131-32 (9th Cir.2003). The FCC’s attempts to exempt certain carriers from the requirements of § 203, however, were invalidated by the Supreme Court. MCI Telecomms. Corp. v. AT & T Corp., 512 U.S. 218, 225-29, 234, 114 S.Ct. 2223, 129 L.Ed.2d 182 (1994) (holding § 203(b)(2) gives the FCC authority to modify the 1934 Act’s tariff *1193 filing requirement, but not to eliminate it entirely).
Congress responded by enacting the Telecommunications Act of 1996 (“1996 Act”), which required the FCC to “forbear from applying” the filed rate doctrine if it determined application of the doctrine was: (1) “not necessary to ensure that the charges, practices, classifications, or regulations ... are just and reasonable and are not unjustly or unreasonably discriminatory,” (2) “not necessary for the protection of consumers,” and (3) “consistent with the public interest.” 47 U.S.C. § 160(a). The FCC subsequently issued a Notice of Proposed Rulemaking on March 25, 1996, to forbear from applying the tariffing requirements of § 203 of the 1934 Act. In re Policy & Rules Concerning the Interstate, Interexchange Marketplace, Notice of Proposed Rulemaking, 11 FCC Red. 7141 (1996). Following a comment period, the FCC issued a series of detariff-ing orders, effective August 1, 2001, in which it forbore from enforcing § 203 against long-distance carriers. See In re Policy & Rules Concerning the Interstate, Interexchange Marketplace, Second Order on Reconsideration, 14 FCC Red. 6004 (1999); In re Policy & Rules Concerning the Interstate, Interexchange Marketplace, Order on Reconsideration, 12 FCC Red. 15,014 (1997); In re Policy & Rules Concerning the Interstate, Interexchange Marketplace, Second Report & Order, 11 FCC Red. 20,730 (1996).
The FCC anticipated telecommunications carriers would enter into “short, standard-form contracts” with their customers setting forth the applicable rates, terms, and conditions of service which had previously been set out in the filed tariffs. Second Report & Order, 11 FCC Red. 20,730, ¶ 57. The FCC emphasized carriers would continue to be subject to the substantive prohibitions against unjust, unreasonable, and discriminatory rates and terms contained in §§ 201 and 202 of the 1934 Act. Order on Reconsideration, 12 FCC Red. 15,014, ¶ 77. Specifically, the FCC’s Order on Reconsideration stated:
In the Second Report and Order, we stated that our decision to forbear from requiring nondominant interexchange carriers to file tariffs for interstate, domestic, interexchange services will not affect our enforcement of carriers’ obligations under sections 201 and 202 to charge rates, and impose practices, classifications, and regulations that are just and reasonable, and not unjustly or unreasonably discriminatory. We therefore agree with AT & T, Sprint, and WorldCom that the Communications Act continues to govern determinations as to whether rates, terms, and conditions for interstate, domestic, interexchange services are just and reasonable, and are not unjustly or unreasonably discriminatory. While the parties only sought clarification that the Communications Act governs the determination as to the lawfulness of rates, terms, and conditions, we note that the Communications Act does not govern other issues, such as contract formation and breach of contract, that arise in a detariffed environment. As stated in the Second Report and Order, consumers may have remedies under state consumer protection and contract laws as to issues regarding the legal relationship between the carrier and customer in a detariffed regime.
Id. (footnotes omitted).
To meet its obligations under the detar-iffing orders, AT & T mailed proposed Consumer Services Agreements (“CSAs”) to each of its residential customers in June 2001. The CSAs and the accompanying mailings clearly informed AT & T’s residential customers they could agree to the terms of the CSA by continuing to use, and pay for, AT & T services. The CSAs *1194 provided “[y]ou agree to pay us for the Services at the prices and charges listed in the AT & T Service Guides”[1] and that “[y]ou must pay all taxes, fees, surcharges and other charges that we bill you for the Services.” The CSAs then provided “[t]his agreement incorporates by reference the prices, charges, terms and conditions included in the AT & T Service Guides.”
The Consumer Service Guide described the AT & T Universal Connectivity Charge (“UCC”) as “a monthly charge to Customers to recover amounts AT & T must pay into a federal program called the Universal Service Fund.”[2] The Consumer Service Guide then stated “[t]he Universal Connectivity Charge is equal to 9.9% of your total billed state-to-state and international charges (excluding taxes).” AT & T issued a new guide in advance of each change to the UCC rate and always charged its customers exactly the rate listed in that guide.
The CSAs also contained an arbitration clause with a class action ban. This provision stated “[t]his section provides for resolution of disputes through final and binding arbitration before a neutral arbitrator instead of in a court by a judge or jury or through a class action.” It added “[n]o dispute may be joined with another lawsuit, or in an arbitration with a dispute of any other person, or resolved on a class-wide basis.”
AT & T used a different approach with its business customers, with whom it entered into individually negotiated agreements. Each agreement incorporated by reference the terms of AT & T’s Business Service Guide, which contained the following provision governing regulatory surcharges and miscellaneous charges:
AT & T may adjust its rates and charges or impose additional rates and charges on its Customers in order to recover amounts that it, either directly or indirectly, pays to or is required by governmental or quasi-governmental authorities to collect from others to support statutory or regulatory programs, plus associated administrative costs. Examples of such programs include, but are not limited to, the Universal Service Fund....
The Business Service Guide then listed the UCC rate applicable to the business customers’ interstate and international charges.
This multidistrict litigation originally involved numerous putative class action lawsuits against, inter alia, AT & T. On March 10, 2003, plaintiffs filed a second consolidated and amended class action complaint alleging, among other things, violations of federal antitrust laws, 47 U.S.C. §§ 201(b) and 202, the New York and Kansas statutory consumer protection acts, and breach of contract. As relevant to this appeal, Plaintiff Thomas Cummings, a Pennsylvania resident, sought to represent a nationwide class of AT & T’s residential customers. Plaintiff Sterling Beimfohr sought to represent a nationwide class of AT & T’s business customers.
In October 2002, AT & T filed a motion to dismiss or compel arbitration of various *1195 claims, including Cummings’s claims. The district court granted AT & T’s motion to compel arbitration of Cummings’s claims, holding the FCA preempted the argument that AT & T’s arbitration clause was substantively unconscionable under state law. The district court also concluded the arbitration clause was not procedurally unconscionable. The district court, however, permitted AT & T’s California residential customers’ breach of contract claims to proceed based on the collateral estoppel effect of Ting v. AT & T, 182 F.Supp.2d 902 (N.D.Cal.2002), aff'd, 319 F.3d 1126 (9th Cir.2008).
In December 2007, AT & T moved for summary judgment on the two remaining breach of contract claims in the case: (1) a breach of contract claim brought on behalf of AT & T’s California residential customers; and (2) a breach of contract claim brought on behalf of AT & T’s business customers. The class period for these breach of contract claims was August 1, 2001 to March 31, 2003. The district court granted AT & T’s motion as to the breach of contract claim brought on behalf of AT & T’s business customers, but denied it as to the breach of contract claim brought on behalf of AT & T’s California residential customers.
A jury trial ensued. The jury found in favor of the California residential customer plaintiffs on the breach of contract claim and awarded $16.881 million in damages against AT & T. Both parties filed post-trial motions. The court denied AT & T’s motion for entry of judgment and for a new trial and granted in part and denied in part both AT & T’s motion for a remittitur and plaintiffs’ motion for prejudgment interest. The court reduced the verdict to $10,931,000, and awarded prejudgment interest of $5,546,958.41, for a total award of $16,477,958.41. The subclass of California residential customers accepted the remitted judgment, which the district court promptly entered, and AT & T filed a timely notice of appeal.
On appeal, AT & T argues it is entitled to a judgment as a matter of law on the California residential customers’ breach of contract claims or to a new trial. In the alternative, AT & T argues it is entitled to further remittitur of the damages award. On cross-appeal, the plaintiffs argue the district court erred in enforcing AT & T’s arbitration clause against the non-California residential plaintiffs, and that it erred in granting summary judgment on AT & T’s business customers’ breach of contract claims.
III. Analysis
1. Preemption
The district court’s order compelling arbitration is reviewable after final judgment. 9 U.S.C. § 16(a)(3); Quinn v. CGR, 828 F.2d 1463, 1466 (10th Cir.1987). This court reviews the order compelling arbitration de novo applying the same legal standard employed by the district court. Armijo v. Prudential Ins. Co. of Am., 72 F.3d 793, 796 (10th Cir.1995).
The non-California residential plaintiffs argue the district court erred in concluding §§ 201 and 202 of the FCA preempt their state-law claims that the arbitration clauses in the CSAs should not be enforced due to their substantive unconscionability. Federal preemption power is derived from the Supremacy Clause in Article VI of the United States Constitution. Choate v. Champion Home Builders Co., 222 F.3d 788, 791 (10th Cir.2000). Federal law preempts state law in three circumstances: (1) where a statute has an express preemption provision, (2) where Congress intends federal law to “occupy the field,” and (3) “to the extent of any [state-law] conflict with a federal statute.” Crosby v. Nat’l Foreign Trade Council, *1196 530 U.S. 363, 372, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000) (quotation omitted). The ultimate touchstone of the preemption analysis is congressional intent. Cipollone v. Liggett Group, Inc., 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992). Because §§ 201 and 202 of the FCA do not contain an express preemption provision, only field and conflict preemption are at issue in this case.
a. Field Preemption
AT & T contends the uniformity principle embodied in §§ 201 and 202 of the FCA sufficiently occupies the field to preempt all state-law regulation of long-distance contracts. See Cipollone, 505 U.S. at 516, 112 S.Ct. 2608 (stating field preemption occurs when “federal law so thoroughly occupies a legislative field as to make reasonable the inference that Congress left no room for the states to supplement it” (quotations omitted)). The FCC’s detariffing orders, however, explicitly contemplate a role for state law in the deregulated long-distance market. See Order on Reconsideration, 12 FCC Red. 15,014, at ¶ 77 (“[CJonsumers may have remedies under state consumer protection and contract laws as to issues regarding the legal relationship between the carrier and customer in a detariffed regime.”). Accordingly, because state law expressly supplements federal law in the regulation of interstate telecommunications carriers, field preemption does not apply. See also Ting, 319 F.3d at 1136 (“[F]ield preemption is not an issue because state law unquestionably plays a role in the regulation of long distance contracts.”); Boomer v. AT & T Corp., 309 F.3d 404, 424 (7th Cir.2002) (indicating field preemption likely no longer applies after detariffing but not expressly resolving the issue).
b. Conflict Preemption
 Plaintiffs argue the district court erred in concluding the non-California residential plaintiffs’ substantive unconsciona-bility claims were preempted because they conflict with the uniformity principle incorporated in §§ 201 and 202 of the FCA. Conflict preemption occurs “where it is impossible for a private party to comply with both state and federal requirements, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.” Choate, 222 F.3d at 792 (quotation omitted); see also Mount Olivet Cemetery Ass’n v. Salt Lake City, 164 F.3d 480, 489 (10th Cir.1998) (“Conflict preemption requires that the state or local action be a material impediment to the federal action, or thwart[ ] the federal policy in a material way.”).
There is a circuit split on whether the uniformity principle embodied in §§ 201 and 202 of the FCA has preemptive force in the wake of the FCC’s detariffing orders. In Boomer, the Seventh Circuit held §§ 201 and 202 of the FCA preempt state substantive unconscionability challenges to the CSA’s arbitration clause. 309 F.3d at 418. Boomer reasoned §§ 201 and 202, “read together, demonstrate a congressional intent that individual long-distance customers throughout the United States receive uniform rates, terms and conditions of service.” Id. In arriving at this conclusion, Boomer noted § 203, which the FCC forbore from applying after passage of the 1996 Act, “merely served as a mechanism by which the FCC could assure compliance with the standards set forth in Sections 201 and 202,” and that the goals of prohibiting and punishing unequal rates and preventing discrimination embodied in those sections survived detariffing. Id. at 421 (“[E]ven though the FCC no longer mandates the filing of tariffs, the congressional objective of providing uniform rates, terms and conditions remains, as does the federal prohibition on terms and conditions which are unjust or unreasonable.”). As a result, the Seventh Circuit concluded “[a]l- *1197 lowing state law challenges to the validity of the terms and conditions contained in long-distance contracts ... results in the very discrimination Congress sought to prevent” and, therefore, concluded such state law challenges were preempted. Id. at 423.
Shortly after Boomer was decided, the Ninth Circuit reached the opposite result in Ting, 319 F.3d at 1135. Ting held California’s unconscionability law did not “stand[ ] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress in enacting §§ 201(b) and 202(a) of the [FCA].” Id. at 1137 (quotation omitted). Unlike Boomer, Ting believed § 203 to be the “heart of the common-carrier section of the Communications Act.” Id. at 1141 (quotation omitted); id. at 1142 (“[I]n authorizing the FCC to forbear from enforcing the tariff filing requirement, Congress not only removed its chosen means of enforcing §§ 201 and 202, it removed the heart of the 1934 Act.” (quotations omitted)). Without § 203, Ting held the remaining provisions of the FCA lacked preemptive force because they “contain[ed] substan-five standards that are enforceable only if they have an enforcement vehicle, such as the filing requirement.” Id. at 1142. The Ting decision then turned to congressional intent underlying the 1996 Act, and held Congress intended a “competition based regime” in which “state law protections are no longer excluded as they once were under the express terms of the filed rate doctrine.” Id. at 1143; id. at 1146 (“[WJhereas Congress previously required tariffs to ensure strict uniformity with §§ 201 and 202’s standards, Congress now relies on competition to ensure a more market-oriented (and less collusive) level of compliance with §§ 201 and 202.”). Ting therefore concluded there was no conflict between the remaining sections of the FCA and California’s unconscionability law. Id. at 1146.[3]
This court agrees with the Seventh Circuit’s determination in Boomer that the uniformity principle embodied in §§ 201 and 202 of the FCA survived detariffing and preempts state law challenges to the reasonableness of the rates, terms, and conditions of service provided by telecommunications carriers. Section 201(b) of *1198 the FCA provides: “All charges, practices, classifications, and regulations for and in connection with such communication service, shall be just and reasonable, and any such charge, practice, classification or regulation that is unjust or unreasonable is declared to be unlawful.” 47 U.S.C. § 201(b). Section 202(a) of the FCA provides:
It shall be unlawful for any common carrier to make any unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities, or services for or in connection with like communication service, directly or indirectly, by any means or device, or to make or give any undue or unreasonable preference or advantage to any particular person, class of persons, or locality, or to subject any particular person, class of persons, or locality to any undue or unreasonable prejudice or disadvantage.
47 U.S.C. § 202(a). These sections “demonstrate a congressional intent that individual long-distance customers throughout the United States receive uniform rates, terms and conditions of service.” Boomer, 309 F.3d at 418; see also Cent. Office Tel., 524 U.S. at 223, 118 S.Ct. 1956 (“It is that antidiscriminatory policy which lies at the heart of the common-carrier section of the Communications Act.”) (quotation omitted). Applying the laws of all fifty states to AT & T’s interstate long-distance service contracts would impede this Congressional objective of achieving uniformity in the rates, terms and conditions of such services. See Boomer, 309 F.3d at 418-19 (noting that allowing such challenges would result in “patchwork contracts” and “conflict ] with Section 202’s prohibition on providing advantages or preferences to customers based on their ‘locality’ ”).
This conclusion is not altered by the fact that pre-detariffing cases focus predominantly on § 203’s filed-rate doctrine rather than the uniformity principle embodied in §§ 201 and 202. See, e.g., Cent. Office Tel., 524 U.S. at 222-24, 118 S.Ct. 1956 (focusing exclusively on the preemptive effect of § 203); MCI Telecomms. Corp. v. AT & T, 512 U.S. 218, 220, 229, 114 S.Ct. 2223, 129 L.Ed.2d 182 (1994) (referring to the tariff-filing requirement as the “heart” and “centerpiece” of the 1934 Act); ICOM Holding, Inc. v. MCI WorldCom, Inc., 238 F.3d 219, 221-23 (2d Cir.2001) (holding the filed-rate doctrine barred state-law claims pertaining to the price, service, provisioning, and billing of telecommunications services). Not surprisingly, cases brought after detariffing focus solely on the uniformity principle of §§ 201 and 202. See, e.g., Orloff v. FCC, 352 F.3d 415, 420 (D.C.Cir.2003) (holding that post-detariffing, the legality of a telecommunications carrier’s terms of service “depends not on the company’s designation as a common carrier, but on § 202 (and § 201)”).[4]
*1199 That the uniformity principle survived detariffing is also evidenced by the language of the 1996 Act which obligated the FCC to forebear from enforcing aspects of the 1934 Act. The 1996 Act did not allow the FCC to forebear from applying provisions of the 1934 Act as it saw fit. Rather, the 1996 Act limited the FCC’s forbearance authority to provisions which were “not necessary to ensure that the charges, practices, classifications, or regulations ... are just and reasonable and are not unjustly or unreasonably discriminatory,” “not necessary for the protection of consumers,” and “consistent with the public interest.” 47 U.S.C. § 160(a). These requirements explicitly ensured the uniformity goals of §§ 201 and 202 would remain, even in the event the FCC determined the then-existing means of achieving this uniformity, § 203’s filed-rate doctrine, was no longer the preferred mechanism for accomplishing this goal. See Second Report & Order, 11 FCC Red. 20,730, ¶ 27 (concluding “our decision to forbear from requiring nondominant interexchange carriers to file tariffs for interstate, domestic, interexchange services will not affect such carriers obligations under Sections 201 and 202 to charge rates, and to impose practices, classifications and regulations, that are just and reasonable and not unjustly or unreasonably discriminatory”); Order on Reconsideration, 12 FCC Red. 15,014, ¶ 75 (same).
The precise scope of the uniformity principle set out in §§ 201 and 202, however, is more difficult to ascertain than the scope of the filed-rate doctrine, which was “strict[ly]” applied and operated “harsh[ly] in some circumstances.” Cent. Office Tel., 524 U.S. at 222-23, 118 S.Ct. 1956 (quotation omitted); id. at 222, 118 S.Ct. 1956 (noting that under the filed-rate doctrine, “even if a carrier intentionally misrepresents its rate and a customer relies on the misrepresentation, the carrier cannot be held to the promised rate if it conflicts with the published tariff’). For example, in Orloff, the D.C. Circuit held certain differences in rates, such as those which result from a phone carrier reaching different terms of service with similarly situated customers on the basis of market “haggling,” do not run afoul of §§ 201 or 202. 352 F.3d at 421. Similarly, in Panatronic, USA v. AT & T Corp., the Ninth Circuit held a “temporary price difference” caused by a delay in imposing a UCC charge did not constitute unreasonable discrimination in violation of § 202(a). 287 F.3d 840, 844 (9th Cir.2002) (“A difference in price is not unreasonable if there is a neutral, rational basis underlying [the disparity].” (quotation omitted)). FCC orders similarly reflect a trend towards greater tolerance of certain differences in the rates charged by telecommunications providers. See, e.g., In re Digital Cellular, Inc., 20 FCC Red. 8723, ¶ 15 (2005) (holding it is reasonable for a phone carrier to offer service on different terms to materially different companies); In re Bruce Gilmore, 20 FCC Red. 15,079, ¶ 26 (2005) (holding it is reasonable for a phone carrier to negotiate better deals with some customers than others, so long as there is no market failure that prevents customers from switching carriers if they are dissatisfied).
*1200 In light of the uncertainty regarding the scope of §§ 201 and 202 in a detar-iffed marketplace, AT & T filed a petition with the FCC requesting it “clarify that federal, and not state, law governs the determination as to whether a nondominant interexchange carrier’s rates, terms, and conditions ... are lawful.” Order on Reconsideration, 12 FCC Red. 15,014, ¶ 76. In response, the FCC ordered that §§ 201 and 202 of the Communications Act “con-tinuéis] to govern determinations as to whether rates, terms, and conditions for interstate, domestic, interexchange services are just and reasonable, and are not unjustly or unreasonably discriminatory.” Id. at 15,014, ¶ 77. The FCC also concluded that “the Communications Act does not govern other issues, such as contract formation and breach of contract, that arise in a detariffed environment,” and that “consumers may have remedies under state consumer protection and contract laws as to issues regarding the legal relationship between the carrier and customer in a detariffed regime.” Id.
 An agency’s conclusion that state law is preempted is not necessarily entitled to deference. Wyeth v. Levine, — U.S. -, 129 S.Ct. 1187, 1201, 173 L.Ed.2d 51 (2009) (“While agencies have no special authority to pronounce on preemption absent delegation by Congress, they do have a unique understanding of the statutes they administer and an attendant ability to make informed determinations about how state requirements may pose an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.” (quotation omitted)); see also Geier v. American Honda Motor Co., 529 U.S. 861, 883, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000) (according “some weight” to an agency’s interpretation of the preemptive effect of a statute); Medtronic, Inc. v. Lohr, 518 U.S. 470, 505-06, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996) (Breyer, J., concurring) (“[I]n the absence of a clear congressional command as to pre-emption, courts may infer that the relevant administrative agency possesses a degree of leeway to determine which rules, regulations, or other administrative actions will have pre-emptive effect.”). The Wyeth decision made clear “[t]he weight we accord the agency’s explanation of state law’s impact on the federal scheme depends on its thoroughness, consistency, and persuasiveness.” 129 S.Ct. at 1201.
In applying this standard, Wyeth looked to whether the agency’s preemption determination was consistent with the positions it took in the past and whether its rule-making process was procedurally sound. Id. at 1201-03. Wyeth concluded the FDA’s preemption position did not merit deference for two reasons. Id. at 1201. First, it noted the FDA’s notice of proposed rulemaking was completely at odds with its finalized rule. Id. at 1201 (highlighting “[t]he agency’s views on state law are inherently suspect in light of this procedural failure”). Second, the Court discredited the FDA’s position on preemption because it represented a reversal of “the FDA’s own longstanding position without providing a reasoned explanation, including any discussion of how state law has interfered with the FDA’s regulation of drug labeling during decades of coexistence.” Id.
The FCC’s actions in the present case are distinguishable from the FDA’s in Wyeth. This court is not aware of any procedural errors committed by the FCC in promulgating the detariffing orders, and, although the FCC’s ultimate preemption position represented a departure from the one it advanced in a prior detariffing order, the FCC’s ultimate position is consistent with its longstanding policy of interpreting §§ 201 and 202 of the FCA (and similarly worded provisions of the ICA) as ensuring the uniformity of rates, terms, *1201 and conditions provided by interstate telecommunications carriers. Accordingly, this court concludes the FCC’s position that the FCA continues to preempt state law challenges to “the rates, terms, and conditions for interstate, domestic, interex-change services” but not others, such as “contract formation and breach of contract” merits deference. Order on Reconsideration, 12 FCC Red. 15,014, ¶ 77.
The FCC’s notice of proposed rulemak-ing requested commenters to consider the effect of §§ 201 and 202 in the detariffed marketplace. 11 FCC Red. 7141, ¶¶ 94-96. The FCC’s initial response to this question was clear: “in the absence of tariffs, consumers will be able to pursue remedies under state consumer protection and contract laws in a manner currently precluded by the ‘filed-rate’ doctrine.” Second Report and Order, 11 FCC Red. 20,730, ¶ 38; see also id. ¶ 5 (“[W]hen interstate, domestic, interexchange services are completely detariffed, consumers will be able to take advantage of remedies provided by state consumer protection laws and contract law against abusive practices.”); Id. ¶42 (“In the absence of such tariffs, consumers will not only have our complaint process, but will also be able to pursue remedies under state consumer protection and contract laws.”). As noted, however, the FCC clarified its position in a subsequent order, explaining that while the terms and conditions of long-distance service contracts are still governed by the FCA, other aspects of the carriers’ conduct are subject to other federal and state law. Order on Reconsideration, 12 FCC Red. 15,014, ¶ 77. Thus, unlike the regulation in Wyeth, there were no procedural failures during the FCC’s promulgation of the detariffing orders that render the FCC’s preemption position “inherently suspect.” 129 S.Ct. at 1201.
The FCC’s ultimate preemption position nevertheless represented a departure from the position initially taken in its Second Report and Order. The FCC’s clarification, unlike the FDA’s abrupt reversal in Wyeth, however, is reasonable in light of the uncertainty regarding the scope of the uniformity principle embodied in §§ 201 and 202 in the detariffed marketplace. The FCC’s ultimate position is consistent with the FCA’s overarching goal of prohibiting state-by-state variations in the rates, terms, and conditions of interstate telecommunications services. As noted, this uniformity goal is reflected in the language of §§ 201 and 202 of the 1934 Act as well as in the limits the 1996 Act placed on the FCC’s authority to forebear from applying sections of the 1934 Act. The continuing validity of this uniformity principle is underscored by judicial and agency interpretations of §§ 201 and 202 rendered both before and after detariffing. See, e.g., Global Crossing Telecomm., Inc. v. Metrophones Telecomms., Inc., 550 U.S. 45, 55, 127 S.Ct. 1513, 167 L.Ed.2d 422 (2007) (interpreting § 201(b)’s reasonableness requirement post-detariffing); Orloff, 352 F.3d at 420 (interpreting §§ 201 and 202 post-detariffing); Nader v. FCC, 520 F.2d 182, 201 (D.C.Cir.1975) (interpreting § 202’s non-discrimination requirement pre-detariffing); Digital Cellular, 20 FCC Red. 8723, ¶¶ 14-15 (interpreting §§ 201 and 202 postdetariffing); In re RCA Am. Commc’ns, Inc., 84 F.C.C.2d 353, ¶ 8, 1980 WL 121396 (1980) (interpreting the reasonableness requirement of § 201 pre-de-tariffing); see also Postal Tel.-Cable Co. v. Warren-Godwin Lumber Co., 251 U.S. 27, 31, 40 S.Ct. 69, 64 L.Ed. 118 (1919) (holding the uniformity requirements of the ICA barred state-law challenges to a provision in a telegraph company’s contract). Accordingly, although detariffing ended the strict uniformity imposed by § 203’s filed-rate doctrine, it did not lessen the preemptive force of the uniformity requirements that remained in §§ 201 and 202. *1202 The district court’s deferral to the FCC’s order, and its resulting determination that the FCA preempted the non-California residential plaintiffs’ substantive uncon-scionability claims, but not their procedural unconscionability claims, is therefore correct. On appeal, the plaintiffs do not challenge the district court’s conclusion that the CSAs’ arbitration clauses were procedurally conscionable under New York state law. Accordingly, the district court did not err in enforcing those arbitration clauses against the non-California residential plaintiffs.
2. Business Customers’ Breach of Contract Claims
This court reviews the district court’s order granting AT & T summary judgment on the business customers’ breach of contract claims de novo applying the same legal standard as the district court. Union Standard Ins. Co. v. Hobbs Rental Corp., 566 F.3d 950, 952 (10th Cir. 2009). The business customer plaintiffs alleged AT & T breached its contracts by charging them for administrative expenses that were not associated with the collection of the UCC. In granting AT & T’s motion, the district court correctly decided the plaintiffs failed to raise a genuine issue of material fact.
The relevant provision in AT & T’s Business Service Guide allowed AT & T to collect the amounts it paid into the USF “plus associated administrative costs.” The Business Service Guide also listed the UCC rate applicable to the business customers’ interstate and international charges. The business customers argue AT & T calculated the amount of administrative costs it billed on costs other than those “associated” with the collection and payment of USF expenses. Specifically, the plaintiffs point to AT & T’s Undisputed Fact No. 44, which described its method of calculating administrative expenses:
The ABS administrative expense estimates (sometimes referred to as “overheads”) were calculated by taking actual administrative expenses “for all business services,” dividing it “by the underlying revenues” to obtain an administrative expense “percentage of total revenues,” and multiplying that administrative-expense percentage by the total billed USF revenues.
These rates ranged from 9.97% to 10.97% of the UCC, which in turn amounted to approximately 1.0% of a customer’s total interstate and international phone charges. On April 1, 2003, after the close of the class period, AT & T’s method of billing for the administrative expenses associated with the UCC changed. This change came shortly after an FCC order required the carriers separately disclose to their customers any administrative expenses associated with the UCC charge. In re Federal-State Joint Board on Universal Service, CC Docket Nos. 96-4-5, 98-171, 92-237, 99-200, 95-116, 98-170, Report & Order & Second Further Notice of Proposed Rulemaking, 17 FCC Red. 24,952, ¶ 48 (2002). This new, separately listed Administrative Expense Fee was 0.74% of a customer’s total interstate and international phone charges during its first year in existence, and 0.88% during its second.
The plaintiffs argue AT & T’s method of calculating UCC administrative expenses was flawed because it made no attempt to quantify and assess the actual costs “associated” with administering the USF. Plaintiffs contend this fact alone precluded summary judgment because AT & T’s expenses for “all business services” were not associated with the collection and payment of the USF. The undisputed fact cited by the plaintiffs does not establish a triable issue on whether AT & T recovered administrative expenses not associated with the USF. It stated only that the total administrative expenses recovered through the UCC were calculated by determining *1203 the administrative expenses associated with each dollar of revenue from “all business services” and then “multiplying” that percentage figure by the “billed USF revenues.” There is no evidence this method could have resulted in an over-recovery of administrative expenses associated with the USF. In particular, there is no evidence the administrative tasks and expenses associated with billing and collecting the UCC were less cost sensitive than those associated with billing and collecting other revenues for business services.
The business customer plaintiffs next contend the undisputed fact that the percentage rate AT & T charged was lower after the FCC’s April 1, 2003 rule change created a triable issue as to whether AT & T overcharged its business customers during the class period. This argument also fails. Plaintiffs fail to point to any evidence indicating AT & T’s method of calculating the UCC administrative charge changed when the FCC’s listing requirement was imposed. Nor do they point to evidence indicating the fluctuations in the administrative charges associated with the UCC trended differently from those associated with other aspects of AT & T’s operations. Evidence of a reduction in the administrative charge from 1.0% to 0.74%, and subsequent increase to 0.88%, standing alone, does not create a genuine issue of material fact as to whether AT & T charged its business customers for administrative costs not associated with the USF prior to the FCC’s order. Accordingly, the district court’s dismissal of the business customers’ breach of contract claim was proper.
3. California Residential Customers Breach of Contract Claims
The district court denied AT & T’s motion for summary judgment with respect to the breach of contract claims brought by the California residential customers. AT & T renewed its summary judgment motion with respect to the residential customers claims, and the district court similarly denied the renewed motion. After the jury found in favor of the California residential customers at trial, AT & T filed a motion for judgment as a matter of law and a motion for a new trial, both of which the district court denied. The district court’s interpretation of the CSA, including its determination that the CSA was unambiguous, is reviewed de novo. Level 3 Commc’ns, LLC v. Liebert Corp., 535 F.3d 1146, 1154-55 (10th Cir.2008). The district court’s jury instructions are reviewed de novo to determine whether, as a whole, they “correctly stated the governing law and provided the jury with an ample understanding of the issues and applicable standards.” O’Tool v. Genmar Holdings, Inc., 387 F.3d 1188, 1198 (10th Cir.2004). The parties agree the contract claims are governed by New York law.
AT & T asserts that, as a matter of law, it could not have breached its obligations under the CSA because it always charged the UCC percentage specified in the applicable Consumer Service Guide. The proper interpretation and effect of the description of the UCC provided in the Consumer Service Guide is central to the resolution of AT & T’s claim on appeal. That description reads: “The AT & T Universal Connectivity Charge is a monthly charge to Customers to recover amounts AT & T must pay into a federal program called the Universal Service Fund (USF).” The district court determined this description unambiguously allowed AT & T to recover amounts AT & T must pay into the USF, and no more.
First, AT & T asserts that the “Description” sections of the Consumer Service Guides were not incorporated into the CSAs. AT & T is incorrect. The relevant language of the CSAs state:
“AT & T Service Guides” contain the specific prices and charges, service de *1204 scriptions and other terms and conditions not set forth here that apply to each of your Services.... THIS AGREEMENT INCORPORATES BY REFERENCE THE PRICES, CHARGES, TERMS AND CONDITIONS INCLUDED IN THE AT & T SERVICE GUIDES.
The CSAs then repeatedly make reference to “the incorporated AT & T Service Guides.” The passage from the CSAs quoted above unambiguously incorporates the description of the UCC. The absence of the word “descriptions” from the capitalized sentence does not prevent the incorporation of the “Description” sections of the Service Guides. To the contrary, the use of the word “other” in the first sentence indicates the descriptions are in fact considered part of the terms and conditions that govern the contractual relationship.[5] Furthermore, the description of the UCC provided by the Service Guides contains a promise to set the UCC rate by reference to AT & T’s own USF payments. This term is unambiguously incorporated into the CSAs by the CSAs’ incorporation provision.
Second, AT & T argues that the promise is unenforceable due to its location in a “description” section of the contract. For support, AT & T cites Phillips v. AIG, Inc., in which a district court refused to interpret a general description of the interest rate in an annuity contract as containing a separate, enforceable promise. 498 F.Supp.2d 690, 695 (S.D.N.Y.2007). Phillips’s rejection of the plaintiffs argument was based upon the content, not location of the provision. Id. (stating the language at issue “standing alone, merely explains that interest rates quoted elsewhere in the Annuity Contracts are ‘effective annual interest rates’ and does not make any independent promise about what those interest rates are”). The remaining cases cited by AT & T all address the effect of language found in introductory recital clauses such as “Purpose” and “Whereas” clauses. United States v. Hamdi, 432 F.3d 115, 123 (2d Cir.2005) (construing prefatory language of a plea agreement); Aramony v. United Way of Am., 254 F.3d 403, 413 (2d Cir.2001) (holding “because the plan specifies with such clarity which tax provisions are to be taken into account, we find it unreasonable to treat the imprecision of the general purpose clause as overriding the specificity of the detailed computation clauses”); Ge-novese Drug Stores, Inc. v. Conn. Packing Co., 732 F.2d 286, 291 (2d Cir.1984) (holding “an expression of intent in a ‘whereas’ clause of an agreement between two parties may be useful as an aid in construing the rights and obligations created by the agreement, but it cannot create any right beyond those arising from the operative terms of the document”); Jones Apparel Group, Inc. v. Polo Ralph Lauren Corp., 16 A.D.3d 279, 791 N.Y.S.2d 409, 410 (N.Y.App.Div.2005) (holding “[sjince the contract is unambiguous on its face, there is no need to refer to its recitals”); Trump Vill. Section 3, Inc. v. N.Y. State Hous. Fin. Agency, 292 A.D.2d 156, 739 N.Y.S.2d 37, 38 (N.Y.App.Div.2002) (same).
According to AT & T, the difference between such recital clauses and the “Description” sections of the Consumer Service Guides is irrelevant under New York law. See Sengillo v. Valeo Electrical Systems, Inc., 536 F.Supp.2d 310, 312 (W.D.N.Y.2008). The Sengillo case, how *1205 ever, merely stands for the proposition that “introductory recitals which serve no operative purpose” generally do not contain “enforceable contractual term[s]” regardless of how they are named. Id. at 312. In contrast, the “Description” sections of the AT & T Service Guides were incorporated into the CSAs for the purpose, according to the CSA language itself, of providing the “the specific prices and charges, service descriptions and other terms and conditions not set forth here that apply to each of your Services.” Rather than introduce terms more fully set forth in other sections of an operative agreement, the Service Guides provided the operative terms and conditions that were binding upon the parties and not set forth elsewhere in their agreements. Furthermore, unlike the introductory language at issue in the cases cited by AT & T, the description of the UCC in the Service Guides makes an independent promise as to the nature of that charge. It unequivocally states that the UCC “is a monthly charge to Customers to recover amounts AT & T must pay” into the USF.[6] None of the authorities cited by AT & T support invalidating this promise simply because it is located in a “description” section of an expressly incorporated service guide.
Third, AT & T argues the description of the UCC cannot constitute a separate and independent promise under New York law because it merely explains what the UCC charge is without imposing any separate obligation on AT & T. Under New York law, “[a] promise is a manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made.” Merritt Hill Vineyards, Inc. v. Windy Heights Vineyard, Inc., 61 N.Y.2d 106, 472 N.Y.S.2d 592, 460 N.E.2d 1077, 1081 (1984) (quotation omitted). This means that a contract contains “any promises which a reasonable person in the position of the promisee would be justified in understanding were included.” Sutton v. East River Savs. Bank, 55 N.Y.2d 550, 450 N.Y.S.2d 460, 435 N.E.2d 1075, 1078 (1982) (quotations omitted). As a result, words such as “agree,” “will,” or “shall,” are not required to form a promise under New York law. See id. (taking into account “not merely literal language, but whatever may be reasonably implied therefrom”).[7]
*1206 A reasonable promisee would certainly-read the phrase, “The AT & T Universal Connectivity Charge is a monthly charge to Customers to recover amounts AT & T must pay into the [USF]” as a promise that AT & T would charge a UCC in the amount it must pay into the USF and no more. Accordingly, the phrase constitutes a valid promise under New York law.
Fourth, AT & T argues the district court impermissibly added language and terms to the agreements between the parties. AT & T’s argument centers around the district court’s conclusion “as a matter of law that the contract unambiguously provides that AT & T could ‘recover amounts AT & T must pay’ into the USF program, and no more,” as well as its decision to imply AT & T had an obligation to balance the UCC amounts it recovered with the amounts it was required to pay over a reasonable period of time.
Under New York law, it is well settled that courts “may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing.” Bailey v. Fish & Neave, 8 N.Y.3d 523, 837 N.Y.S.2d 600, 868 N.E.2d 956, 959 (2007) (quotation omitted). However, it is equally well-settled that “[b]efore rejecting an agreement as indefinite, a court must be satisfied that the agreement cannot be rendered reasonably certain by reference to an extrinsic standard that make its meaning clear.” Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp., 74 N.Y.2d 475, 548 N.Y.S.2d 920, 548 N.E.2d 203, 206 (1989). “The conclusion that a party’s promise should be ignored as meaningless is at best a last resort.” Id. (quotation omitted).
The district court did not add a term to the CSAs by ruling AT & T could “recover amounts AT & T must pay” into the USF program, “and no more.” Rather, adding “and no more” merely emphasized the operative promise which governs the contractual relationship between AT & T and its customers. As previously discussed, that promise was that AT & T would collect via the UCC charge those amounts “it must pay” into the USF. Thus, the district court’s addition of the phrase “and no more” merely emphasized the reality of what the parties had already agreed to. Interpreting the contract to allow AT & T to recover amounts in addition to “what it must pay into [the USF],” by contrast, involves a distortion of the contract’s meaning not permissible under New York law. Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P., 13 N.Y.3d 398, 892 N.Y.S.2d 303, 920 N.E.2d 359, 363 (2009).
Further, the district court did not err in implying a reasonable time period into the CSAs. Under New York law, “[w]hen a contract does not specify time of performance, the law implies a reasonable time.” Savasta v. 470 Newport Assocs., 82 N.Y.2d 763, 603 N.Y.S.2d 821, 623 N.E.2d 1171, 1172 (N.Y.1993). “What constitutes a reasonable time for performance depends upon the facts and circumstances of the particular case.” Id. 603 N.Y.S.2d 821, 623 N.E.2d at 1172; see also Haines v. City of New York, 41 N.Y.2d 769, 396 N.Y.S.2d 155, 364 N.E.2d 820, 822-23 (1977) (“In the absence of an express term *1207 fixing the duration of a contract, the courts may inquire into the intent of the parties and supply the missing term if a duration may be fairly and reasonably fixed by the surrounding circumstances and the parties’ intent.”). The district court properly determined the contract to be sufficiently definite to require AT & T to calibrate its UCC collections to match its required USF payments over a reasonable period of time. Accordingly, AT & T could breach its promise by repeatedly overcollecting UCC charges without timely issuing refunds or revising its UCC rate to compensate for its overbilling.
Fifth, AT & T argues the district court’s reading of the CSA allows the general description of the UCC to improperly override the specific UCC rates listed in the incorporated Service Guides. This is not the case. Under New York law, “a contract should be construed so as to give full meaning and effect to all of its provisions.” Duane Reade, Inc. v. Cardtronics, LP, 54 A.D.3d 137, 863 N.Y.S.2d 14, 19 (N.Y.App.Div.2008). The provisions at issue impose separate obligations that can be read to give full meaning and effect to both. In the first promise, AT & T agreed to limit its UCC collections to amounts it was required to pay into the USF, and provided a mechanism for changing this rate. In the second promise, AT & T agreed to assess the UCC at a specific percentage. It is perfectly reasonable for the CSAs to include an obligation regarding how the UCC rate is set separate from an obligation to charge the stated rate. The second promise does not pertain to the permissible scope of UCC collections; rather, it only defines the mechanism for collecting funds for a particular period. Accordingly, the district court’s reading did not allow general language of the CSAs to impermissibly override specific language. Rather, its reading properly gave full meaning and effect to both portions of the contract.[8]
Finally, AT & T argues the California residential plaintiffs’ construction of the contracts renders them absurd. AT & T correctly notes that under New York law, “[a] contract should not be interpreted to produce a result that is absurd, commercially unreasonable, or contrary to the reasonable expectations of the parties.” Lipper Holdings LLC v. Trident Holdings, LLC, 1 A.D.3d 170, 766 N.Y.S.2d 561, 562 (N.Y.App.Div.2003) (citations omitted); accord Fresh Del Monte Produce N.V. v. Eastbrook Caribe A.V.V., 40 A.D.3d 415, 836 N.Y.S.2d 160, 164 (N.Y.App.Div.2007). These cases, however, do not support excising an agreed upon promise merely because it imposes an inconvenient burden on one of the parties; rather, they address true absurdities. See, e.g., Fleischman v. Furgueson, 223 N.Y. 235, 119 N.E. 400, 402 (1918) (refusing to construe an ambiguous separation agreement to give the surviving husband greater access to the wife’s property than he would have had “if they had lived happily together”); Fresh Del Monte Produce, 836 N.Y.S.2d at 164 (holding that an indemnification provision making a party liable for a company’s “decline in value” did not encompass unrealized losses, such as a transitory decline in stock price); Lipper, 766 N.Y.S.2d at 562 (limiting general partner’s discretion to revalue limited partners’ capital accounts to pre *1208 vent, inter alia, general partner from being permitted to retain incentive compensation based on phantom profits); Tougher Heating & Plumbing Co., Inc. v. State, 73 A.D.2d 732, 423 N.Y.S.2d 289, 289 (N.Y.App.Div.1979) (declining the invitation to interpret an ambiguous labor cost saving provision in a construction contract to allow the contractor to recover $100,000 if they performed the contract at a savings of $100,000, but only $500 if they performed at a savings of $101,000).
In the present case, AT & T alleges that it was difficult for it to predict the amounts it must pay to the USF due to the methodology used to calculate its contribution level. Certainly, this made it virtually impossible for AT & T to charge exactly the correct amount each billing cycle. AT & T could, however, implement a mechanism to allow it to calibrate its charges over several billing cycles[9] to prevent repeated over-billing.[10] The fact that the lag between the calculation and the billing of the USF forced AT & T to charge its customers a higher percentage rate than the USF percentage rate does not render absurd AT & T’s promise to charge a UCC in the amount it must pay. Finally, that AT & T was not required to recover the exact amount of its USF contributions is a non sequitur. As noted above, in addition to fulfilling its federal obligations under 47 U.S.C. § 201(b), AT & T promised its customers to charge a UCC only in the amount it must pay into the USF. This left AT & T with the option of either undercollecting the UCC or overcollecting the UCC and instituting a mechanism to calibrate its collections to match its required USF payments over a reasonable period of time. The difficulty AT & T experienced in fulfilling its contractual obligation does not render the underlying promise unreasonable or absurd. For all of the foregoing reasons, this court affirms the district court’s denial of AT & T’s motion for judgment as a matter of law.[11]
AT & T’s alternative argument, that it is entitled to a new trial on plaintiffs’ breach of contract claim, is similarly premised on the district court’s conclusion that the CSA unambiguously required AT & T to set its UCC so as to “ ‘recover amounts AT & T must pay’ into the USF program, and no more.” The district court gave the following jury instruction:
AT & T’s contract with ... plaintiffs permitted AT & T to impose a monthly USF charge on its customers to recover amounts AT & T was required to pay into the federal USF program. Thus, if you find that AT & T actually imposed charges greater than that necessary to recover amounts AT & T was required to pay into the federal USF program, you will find that AT & T breached its contract with the subclass of plaintiffs.
AT & T argues that even if this court rejects its argument that, as a matter of law, the CSAs did not create an enforceable promise to match the UCC charge with AT & T’s USF expenditures, the district court nevertheless should have re *1209 garded the CSAs as ambiguous and left the issue for the jury.
Under New York law, a contract’s meaning can be determined as a matter of law only when the relevant contract language is “wholly unambiguous” and conveys a “definite meaning.” Topps Co. v. Cadbury Stani S.A.I.C., 526 F.3d 63, 68 (2d Cir.2008). Ambiguity, in this context, hinges on whether “the agreement on its face is reasonably susceptible of more than one interpretation.” Chimart Assocs. v. Paul, 66 N.Y.2d 570, 498 N.Y.S.2d 344, 489 N.E.2d 231, 233 (1986); see. also Palmieri v. Allstate Ins. Co., 445 F.3d 179, 191 (2d Cir.2006) (“Ambiguous language is that which is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.” (quotation omitted)).
The district court’s jury instruction on the residential plaintiffs’ breach of contract claim “correctly stated the governing law and provided the jury with an ample understanding of the issues and applicable standards.” O’Tool, 387 F.3d at 1198. The CSAs, and the incorporated Service Guides, unambiguously required AT & T to set the UCC charge at the amount AT & T “must pay” into the federal USF program. This language is not reasonably susceptible to more than one interpretation. Accordingly, AT & T is not entitled to a new trial on the residential customers’ breach of contract claim.
4. Remittitur
AT & T seeks to amend the judgment, pursuant to Fed.R.Civ.P. 59(e), to effect a further remittitur or reduction of the damages awarded to the residential customer plaintiffs by the jury on the claim for breach of contract. A district court’s denial of a motion for remittitur is reviewed for an abuse of discretion. Gasperini v. Center for Humanities, Inc., 518 U.S. 415, 434-35, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996). When a state’s substantive law governs a claim for relief, “state law provides the appropriate rules of decision for the district court to determine whether the verdict was excessive.” Century 21 Real Estate Corp. v. Meraj Int’l Inv. Corp., 315 F.3d 1271, 1281 (10th Cir.2003). Under New York law, a court will only disturb a jury’s damages award if “the jury could not have reached its verdict on any fair interpretation of the evidence,” Medco Plumbing, Inc. v. Sparrow Constr. Corp., 22 A.D.3d 647, 802 N.Y.S.2d 730, 732 (N.Y.App.Div.2005), or if the award is not “within reasonable bounds and supported by the evidence,” Carpenter v. Weichert, 51 A.D.2d 817, 379 N.Y.S.2d 191, 194 (N.Y.App.Div.1976).
The jury was given the following instruction on the measure of damages for the breach of contract claim:
The measure of damages for a breach of contract is the amount that will compensate plaintiffs for the loss caused by the breach. In this case, if you find for the subclass of plaintiffs on their claim for breach of contract, the proper measure of damages is the amount by which the USF charges collected by AT & T from its California residential customers exceeded the amount AT & T was required to pay into the Universal Service Fund for those customers.
AT & T argues the jury failed to follow this instruction in calculating damages because it did not include a $5,190,000 payment it made into the USF in 2005 for liabilities incurred during the class period.
This payment became necessary because AT & T refused to pay USF contributions on revenue earned from prepaid calling cards for several years and accordingly did *1210 not collect USF contributions from its prepaid calling card customers. In 2005, the FCC ordered AT & T to contribute to the USF on the basis of prepaid calling card revenue, including revenues earned from preceding periods. In re AT & T Corp. Petition for Declaratory Ruling Regarding Enhanced Prepaid Calling Card Services, 20 FCC Red. 4826, ¶ 31 (2005). AT & T argues these USF payments based on prepaid calling cards sold to California customers during the class period, totaling $5,190,000, should have been included in the figure for AT & T’s USF payments for purpose of the damages calculation under the court’s instruction.
The district court rejected this argument, noting the evidence at trial supported the jury’s damage calculation. First, the plaintiffs’ expert, Dr. Simon Wilkie, testified he did not include the additional payment made in 2005 in his calculations because the expense was incurred long after the plaintiffs had been assessed the UCC charges at issue in this class action. AT & T’s expert, Dr. Lan-genfeld, had no problem with Dr. Wilkie’s refusal to take the calling card adjustment into account for the purpose of calculating anti-trust damages. Finally, Ellen Reid, AT & T’s director of strategic pricing, also testified the calling card expenses were omitted because “[i]t wasn’t considered in the period when we were calculating the rates because we assumed at that point that they were enhanced services and they were not to be assessed USF revenue.” Reid then testified that the AT & T exhibit which omitted prepaid calling card expenses was her “best judgment of the fairest and most accurate way to look at AT & T’s USF collections versus expenses for its residential customers in the period 1998 to March 31, 2003.”
The propriety of the jury’s determination is also bolstered by the district court’s interpretation of the CSAs as requiring AT & T’s UCC collections from residential long-distance customers to match up with its USF payments for that group of customers.[12] The prepaid calling cards at issue “allow[ed] purchasers to make long-distance telephone calls without subscribing to a long-distance service or using a credit card” by providing a consumer the option of purchasing a “fixed number of minutes at a fixed price.” AT & T Co. v. FCC, 454 F.3d 329, 330 (D.C.Cir.2006). AT & T distributed these prepaid cards through “large retail outlets such as Wal-Mart and other third party distributors.” Id. at 330-31. On appeal, AT & T points to no evidence which suggests its failure to impose a UCC charge on its prepaid calling card customers could fairly be compensated by overcharging its residential customers. Accordingly, the jury’s decision to exclude prepaid calling card expenses from its damage analysis is amply supported and constitutes a “fair interpretation of the evidence.” Medco Plumbing, 802 N.Y.S.2d at 732. Thus, the district court did not abuse its discretion in denying AT & T’s motion for remittitur related to the prepaid calling card expenses.
IV. Conclusion
For the foregoing reasons, this court AFFIRMS the decisions of the district court.

. There are two AT & T Service Guides relevant to this appeal: the Consumer Service Guide and the Business Service Guide.

. The UCC description, in its entirety, read: The AT & T Universal Connectivity Charge is a monthly charge to Customers to recover amounts AT & T must pay into a federal program called the Universal Service Fund (USF). The USF helps provide affordable telecommunications services for low-income customers and customers in rural areas. It also provides discounts on Internet access for eligible schools, libraries and rural health care providers. AT & T will revise the Universal Connectivity Charge if the method and/or amount of its required contribution to the USF changes.

. After the Ninth Circuit decided Ting, the Seventh Circuit reaffirmed its position in Dreamscape Design, Inc. v. Affinity Network, Inc., 414 F.3d 665 (7th Cir.2005) ("For the reasons we discussed at length in Boomer, we do not see how Congress’s clearly expressed intent regarding uniformity and reasonableness of rates, as demonstrated in Sections 201 and 202 of the FCA, can be squared with Ting's apparent conclusion that state contract law can invalidate the terms or conditions of long-distance contracts after detariffing.”). Several state courts have followed the Seventh Circuit’s approach. See World-Link, Inc. v. Mezun.com, Inc., 14 Misc.3d 745, 827 N.Y.S.2d 642, 653 (N.Y.Sup.Ct.2006) ("[B]e-cause entitling Mezun to receive different rates, terms, and conditions of service from World-Link’s other customers creates an obvious obstacle to the accomplishment of equality and uniformity of rates and terms of service, Mezun's common law defenses of waiver and equitable estoppel are preempted by sections 201 and 202 of the Communications Act.”); Ramette v. AT & T Corp., 351 Ill.App.3d 73, 285 Ill.Dec. 684, 812 N.E.2d 504, 514 (2004) ("We agree with Boomer ... that the congressional objective of achieving uniformity in rates, terms, and conditions of service survived detariffing. Allowing state challenges would impede the congressional objective of achieving uniformity in telecommunication services.”); Field v. AT & T Corp, No. CV030827266S, 2004 WL 615686, at *2 (Conn.Sup.Ct. Mar. 12, 2004) ("Boomer ... seem[s] to be more persuasive concerning the federal preemption arguments....”). At least one state court has sided with Ting. See McKee v. AT & T Corp., 164 Wash.2d 372, 191. P.3d 845, 855 (2008) ("We agree with the Ninth Circuit that reliance on sections 201 and 202 for federal preemption is untenable.").

. Pre-1934 cases decided under the Interstate Commerce Act (ICA) support the conclusion that the preemptive force of the language of §§ 201 and 202 was not tethered to § 203. The 1934 Act was modeled after the ICA, see AT & T v. Cent. Office Tel., Inc., 524 U.S. 214, 222, 118 S.Ct. 1956, 141 L.Ed.2d 222 (1998); MCI Telecomms. Corp. v. FCC, 917 F.2d 30, 38 (D.C.Cir.1990), and §§ 201 and 202 carried forward the substantive requirements of §§ 1-3 of the ICA. See H.R.Rep. No. 73-1850, at 4 (1934) (noting the 1934 Act copied those sections of the ICA verbatim "to preserve the value of court and commission interpretation” of those provisions); see also Ivy Broad. Co. v. AT & T Co., 391 F.2d 486, 490-91 (2d Cir.1968) ("Since the Communications Act and the 1910 amendment to the Interstate Commerce Act were intended to achieve the same objectives with regard to communications carriers, cases decided prior to 1934 under the Interstate Commerce Act retain their importance for purposes of determining the scope of the Communications Act of 1934.”). Decisions from this period support the notion that a federal uniformity requirement has preemptive effect even in the absence of a tariff filing requirement. See, e.g., VI. Union Tel. Co. v. Esteve Bros. & Co., 256 *1199 U.S. 566, 573, 41 S.Ct. 584, 65 L.Ed. 1094 (1921) (holding state-law challenges to limitation of liability clauses are barred due to the preemptive effect of "the requirement of equality and uniformity of rates laid down in § 3 of the [ICA]”); Postal Tel.-Cable Co. v. Warren-Godwin Lumber Co., 251 U.S. 27, 31, 40 S.Ct. 69, 64 L.Ed. 118 (1919) (holding §§ 1-3 of the ICA barred a state-law challenge to a provision in a telegraph company's contract because it would "wholly destrofy]” the “purpose” of the ICA if “the validity of contracts made by telegraph companies as to their interstate commerce business continued to be subjected to the control of divergent and conflicting local laws”).

. The passage's reference to "service descriptions,” as opposed to "fee descriptions” or “charge descriptions” does not introduce any ambiguity into the incorporation provision. Rather, the incorporation of the "prices, charges, terms and conditions included in the AT & T service guides” unambiguously incorporates the language of the UCC description which permitted AT & T to collect only those amounts "AT & T must pay into [the USF].”

. AT & T also contracted for the right, stated in the final sentence of the Service Guides “Description” of the UCC, to revise its UCC rate if “the amount of its required contribution to the USF changes.” This language further underscores the notion that AT & T was required to tether the UCC rate to the amount it was required to pay into the USF.

. The cases cited by the dissent, Merritt Hill Vineyards, Inc. v. Windy Heights Vineyard, Inc., 61 N.Y.2d 106, 472 N.Y.S.2d 592, 460 N.E.2d 1077 (1984) and United States v. Hamdi, 432 F.3d 115 (2d Cir.2005) do not support the proposition that particular promissory phrases are required to form a binding promise. Merritt Hill addressed the question of whether a provision in a real estate contract was a condition or a promise. 472 N.Y.S.2d 592, 460 N.E.2d at 1081-82. The provision at issue required the seller to produce a title insurance policy and mortgage confirmation at closing. The court concluded it was a condition, in part because it was found under the heading “Conditions Precedent to Purchaser's Obligation to Close,” and in part because "[n]o words of promise were used.” Id.
Hamdi involved the question of whether the phrase, "The defendant’s sentence is governed by the United States Sentencing Guidelines,” constituted a waiver of the defendant’s right to seek a remand. 432 F.3d at 117. Because Hamdi involved the construction of a waiver found in a plea agreement, the court interpreted the language “narrowly” against the government due to the “special due process concerns for fairness and the adequacy of procedural safeguards.” Id. at 122-23 (quotations omitted). Nevertheless, the court observed that the phrase in question, read in isolation, “could be read as a covenant to *1206 which Hamdi agreed,” but it declined to do so based on the context in which the phrase appeared. Id. at 125 (noting also that to the extent the phrase was ambiguous, “well-settled principles of construction of plea agreements [required resolution of] this ambiguity in [the defendant’s] favor”). Accordingly, neither Merritt Hill nor Hamdi support the proposition that only provisions featuring the words "agree,” "will,” or "shall” constitute promises.

. Allowing the promise to charge a particular percentage to override the promise to only charge the amounts AT & T "must pay” effectively writes the latter promise out of the contract. Certainly, the chosen rate would nevertheless also need to comply with the "just and reasonable” requirement found in 47 U.S.C. § 201(b). In this case, § 201(b) does not preempt the California residential plaintiffs' additional state-law claims due to the collateral estoppel effect of Ting v. AT & T, 182 F.Supp.2d 902 (N.D.Cal.2002), aff'd, 319 F.3d 1126 (9th Cir.2003).

. The dissent refers to such mechanisms as "true-up” mechanisms.

. As noted by the dissent, AT & T knew how to implement provisions to provide refunds for overcharged services. AT & T's unilateral failure to implement a similar mechanism to prevent overcollection of UCC does not render the proposition of implementing one absurd or commercially unreasonable.

.This court need not address AT & T’s argument that the district court’s reading of the contract improperly converted the CSA from an individual contract with individual subscribers into a classwide undertaking because AT & T forfeited this argument by failing to raise it below. Rosewood Servs., Inc. v. Sunflower Diversified Servs., Inc., 413 F.3d 1163, 1167 (10th Cir.2005).

. The district court reasoned this term could properly be supplied to the contract for two reasons. First, the evidence indicated "AT & T had separate UCC rates for its business and residential long-distance customers and that AT & T attempted to set each rate by reference to its USF payments for that particular group.” Second, the district court found further support in the FCC's order that "mandated that carriers not shift more than an equitable share of USF contributions to any customer group or group of customers.” AT & T did not challenge this aspect of the district court’s order on appeal.